IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MONOPOLY HOTEL GROUP, LLC,   :
                           :
     Plaintiff,            :
                           :
v.                            :
                           :
HYATT HOTELS CORPORATION,   :      CIVIL ACTION NO.
                           :      1:12-CV-1250-AT
                           :
     Defendant.          :

## ORDER

This business contract dispute is before the Court on a review of Plaintiff's March 31, 2016 Amendment to Complaint [Doc. 135], Defendant Hyatt Hotel Corporation's Motion for Summary Judgment [Doc. 40], Plaintiff Monopoly Hotel Group LLC's Motion to Strike Declaration of John Hughes [Doc. 77][1], and Plaintiff Monopoly's Hotel Group LLC's Motion for Partial Summary Judgment [Doc. 122]. On March 22, 2016, the Court identified a defect in Plaintiff's jurisdictional allegations in its original complaint providing only that "Plaintiff is a Florida limited liability company," and Defendant Hyatt is a Delaware corporation with its principal place of business in Chicago, Illinois. The Court

---

[1] Plaintiff seeks to strike the Declaration of John Hughes, Esq., attached to Defendant's Reply Brief in support of its Motion for Summary Judgment, filed as an attempt to cure authentication and foundation objections made by Plaintiff in response to Defendant's statement of material facts. The Court did not rely on the Hughes Affidavit in consideration of the parties' respective summary judgment motions. Rather, the Court has considered the evidence submitted by the parties to the extent it was undisputed, verified by deposition testimony, or otherwise could be presented in admissible authenticated form at trial. Accordingly, the Court **DENIES AS MOOT** Plaintiff's Motion to Strike Declaration of John Hughes [Doc. 77].

ordered Plaintiff to supplement the complaint with evidence of the citizenship of its members necessary to establish diversity jurisdiction as required under controlling Supreme Court and Circuit authority. The Court then terminated the parties' pending dispositive motions and administratively closed the case until a jurisdictional determination could be made. On March 31, 2016, Plaintiff complied with an amendment and evidence that Monopoly Hotel Group, LLC is wholly owned by John P. Mavrak who is a United States citizen domiciled in England from 2003 to the present. *See* 28 U.S.C. § 1332(a)(2) (providing that district courts shall have original jurisdiction over civil actions between "citizens of a State and citizens or subjects of a foreign state . . . "); *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974) *cert. denied*, 419 U.S. 842 (1974) (holding that "citizenship" means "domicile" for purposes of diversity jurisdiction). Accordingly, the Court **DIRECTS** the clerk to reopen this action and reactivate Defendant Hyatt Hotel Corporation's Motion for Summary Judgment [Doc. 40], Plaintiff Monopoly Hotel Group LLC's Motion to Strike Declaration of John Hughes [Doc. 77], and Plaintiff Monopoly's Hotel Group LLC's Motion for Partial Summary Judgment [Doc. 122].

This case arises out of a 2002 Master License Agreement ("MLA") between Plaintiff Monopoly Hotel Group LLC ("Monopoly") and non-party Hawthorn International, Inc. ("Hawthorn"), granting Monopoly a license to establish and operate franchised hotels under the Hawthorn Suites brand in certain Middle East and North African countries. The terms of the MLA were subsequently

modified after Monopoly failed to meet its payment and development deadlines under the MLA.  On March 15, 2005, before any hotels had been developed, Mike Leven, CEO of Hawthorn, sent Monopoly a letter notifying Monopoly of its default and that Hawthorn had the right to immediately terminate the MLA.  The March 15, 2015 letter notified Monopoly, however, that Hawthorn would agree to extend the development schedule and payment deadlines based on Monopoly's agreement to certain conditions, including the following modification to the process for approving hotel development projects:

> All projects you propose must be approved by us as required under the Master License Agreement.  We will approve projects only if they are in your Territory, the projects meet our approval criteria and you provide us with any information we need to assist in the approval process.  The approval process includes approval by the Approval Committee, which consists of representatives of Hawthorn and Hyatt.  Hyatt now plays a more visible role in the approval process because, as the owner of Hawthorn, Hyatt has responsibility for, among other things, maintaining the integrity of the various brands within the Hyatt portfolio.

Based on this March 15, 2005 letter, Monopoly asserts claims for breach of contract and breach of fiduciary duty against Hyatt Hotel Corporation ("Hyatt").

Monopoly alleges that soon after Hyatt obtained an ownership interest in Hawthorn's parent company, U.S. Franchise Systems, Inc. ("USFS"), Hyatt sought to restrict and limit Monopoly's ability to develop hotels in its contracted territory, in part, because of Hyatt's competing business interests in the territory. Monopoly asserts that once the Approval Committee was in place, Hawthorn ceased to exercise any discretion over the approval process for new developments

in Monopoly's licensed territory and Hyatt became the final authority on approving or disapproving any Monopoly development project. Monopoly contends that by replacing Hawthorn as the party responsible for approving projects, Hyatt was obligated to exercise good faith but breached its obligation to approve qualified franchisees and sites pursuant to the MLA. Rather, Monopoly alleges, Hyatt rejected numerous of Monopoly's proposals in bad faith or delayed approval for extended periods of time causing Monopoly to lose several lucrative pending development opportunities.

Hyatt and Monopoly filed competing summary judgment motions debating (1) the existence of a contract between them, and (2) the creation of a confidential relationship/fiduciary duty between competitors in a business deal.

For the following reasons, the Court **GRANTS** Hyatt's Motion for Summary Judgment [Doc. 40] and **DENIES** Monopoly's Motion for Summary Judgment [Doc. 122].

## I.    Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be

granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324-26. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## II.    Facts

### The Master License Agreement

Monopoly Hotel Group, LLC ("Monopoly") and Hawthorn International, Inc. ("Hawthorn") executed a Master License Agreement ("MLA") dated March 1, 2002. (Def.'s Resp. Pl.'s Stmt. Undisp. Facts ("Def.'s Resp. SMF") ¶ 1, Doc. 128; *see also* Master License Agreement ("MLA"), Doc. 44-1.) The MLA defines "Licensor" as "Hawthorn International, Inc." and the "Master Licensee" as

"Monopoly Hotel Group, LLC." (MLA at p.1). Hawthorn International, Inc. was a wholly owned subsidiary of U.S. Franchise Systems, Inc., which was owned in part by Mike Leven and other shareholder/companies with contractual/ownership interests in Hyatt. (Def.'s SMF ¶¶ 3, 4; Pl.'s SMF ¶¶ 16, 17; Jones Dep. at 37 ("I understand that Hyatt Corporation was a parent, probably not the ultimate parent, of USFS under which USFS, in turn, had Hawthorn subsidiaries.")

The MLA granted Monopoly a master license "to use and, if necessary to adapt," Hawthorn's "Hotel System" in connection with the franchising, ownership and operation of lodging facilities in the countries specified in the MLA. (Pl.'s Resp. Def.'s Stmt. Undisp. Facts ("Pl.'s Resp. SMF") ¶ 2, Doc. 60-1; MLA §§ 1.A, 2.) Originally, those countries consisted of Oman, the United Arab Emirates, Bahrain, Qatar, Kuwait, Saudi Arabia, Turkey, Tunisia, Morocco, and Egypt (the "Territory"). (Pl.'s Resp. SMF ¶ 1; MLA, Attachment A.) The MLA was executed by Michael A. Leven, Chief Executive Officer of Hawthorn and John P. Mavrak, President & CEO of Monopoly. (MLA at p. 27.)

The Hawthorn "Hotel System" is described in Section 1.A of the MLA as consisting of:

> "mid-level economy" hotels that operate under the name "HAWTHORN SUITES," that are intended to compete directly with hotels that are considered "all-suites" or "extended stay" hotels by the lodging industry. Hawthorn Suites or Hawthorn Suites LTD feature studio, one or more bedroom suites with full-equipped kitchens, swimming pools, and other recreational facilities, and

restaurants, banquet facilities and retail outlets, among other features.

(MLA § 1.A.)   It is further defined in Section 1.B of the MLA:

> The Hotel System is composed of elements . . . designed to identify "Hawthorn Suites" hotels to the consuming public and to cause the consuming public to associate "Hawthorn Suites" with the highest quality standards.  The Hotel System at present includes, without limitation, the trade names, trademarks, and service marks, "Hawthorn Suites," . . . prototypical architectural plans, designs, and layouts, that include, without limitation, site plans, floor plans, roof plans, plumbing plans, lobby plans, electrical plans, and landscape plans; a national "800" number for reservation referrals; a national and international Hawthorn Suites directory . . . ; management and personnel training, and training programs and materials, management and operational procedures and techniques as prescribed in the confidential manual (the "Manual"); standards and specifications for construction, equipment, furnishings, as described in the Manual; and advertising, marketing, and promotional programs . . .

(MLA § 1.B.)   However, Section 1.B of the MLA further provides that Monopoly "shall not be limited to Licensor's [Hawthorn's] standards, but may exceed our standards as required to compete in the market." (*Id.*)  And under Section 3.C, Monopoly agreed to construct all hotels "consistent with the U.S. hospitality industry standard of a four star (\*\*\*\*) rating or higher." (MLA § 3.C.)  The MLA required Monopoly to prepare and submit for approval, "[a]t least 90 days prior to the execution of the first Unit Agreement[,] . . . any modifications to Hotel System policies, procedures, and standards (as reflected in the Manual [Hawthorn] supplies to Master Licensee) that Master Licensee believes are necessary" to operate in the Territory. (Pl.'s Resp. SMF ¶ 14; MLA § 4.D.)

In consideration for the rights it received under the MLA, Monopoly agreed, among other things, to pay Hawthorn certain fees, including royalty fees, marketing fees, an initial hotel fee (for each individual hotel agreement entered into), and an Initial Franchise Fee in the amount of $100,000. (Pl.'s Resp. SMF ¶ 7; MLA § 5; Def.'s Resp. SMF ¶ 2; MLA § 5.A.) Monopoly was required to pay $20,000 of the Initial Franchise Fee upon execution of the MLA. (Pl.'s Resp. SMF ¶ 7; MLA § 5.) The $80,000 balance of the Initial Franchise Fee was payable in two installments: (i) $40,000 on the first anniversary of the execution of the MLA; and (ii) $40,000 on the second anniversary of the execution of the MLA. (Pl.'s Resp. SMF ¶ 7; MLA § 5.A.) Monopoly was also required to develop hotels in the Territory in accordance with a Development Schedule as set forth in Attachment B to the MLA. (Pl.'s Resp. SMF ¶ 8; MLA § 3.A.)

Monopoly was required to submit for approval all franchisees and sites for hotels in the Territory under Section 3.B of the MLA:

> Master Licensee [Monopoly] shall be responsible for the selection of suitable franchisees and sites for Hotels in the Territory. Master Licensee [Monopoly] shall submit to Licensor [Hawthorn] for approval or disapproval such site information, franchisee application materials, and other information as Licensor [Hawthorn] reasonably requests for approval of proposed franchisees and Hotels . . . All franchisees are subject to Licensor's [Hawthorn's] approval under substantially the same formal application policies and procedures as those [Hawthorn] applies to its U.S. franchisees.

(Def.'s Resp. SMF ¶ 7; MLA § 3.B.) Monopoly was also required to submit for approval all hotels it proposed to develop in the Territory as follows:

> Hotel Site Plans. . . . Master Licensee [Monopoly] shall prepare or cause the preparation of site plans and architectural plans and specifications that conform with the Hotel System (collectively, the "Site Plans") for each new Hotel and property conversion plans (a "PCP") for each conversion. Master Licensee [Monopoly] shall submit such Site Plans or PCPs to Licensor [Hawthorn] in English for review, comment, and approval prior to the commencement of any construction or renovation. Master Licensee [Monopoly] will develop, operate, or franchise only those Hotels for which Licensor [Hawthorn] has approved such Site Plans or PCPs. Hotel construction or conversions must be consistent with the U.S. hospitality industry standard of a four star (****) rating or higher.

(Pl.'s Resp. SMF ¶ 16; MLA § 3.C.)

Section 14.E of the MLA provided:

> Licensor's [Hawthorn's] consent, wherever required, may be withheld if any default by Master Licensee [Monopoly] exists under this Master Agreement. Approvals and consents by Licensor [Hawthorn] will not be effective unless evidenced by a writing duly executed on behalf of Licensor [Hawthorn]. In each case where Master Licensee [Monopoly] is required under this Master Agreement to submit materials for approval, disapproval or comment by Licensor [Hawthorn], Licensor [Hawthorn] shall respond to Master Licensee [Monopoly] in writing to Licensee [Monopoly] within thirty (30) days communicating such approval, disapproval, or comments, or the submitted materials shall be deemed approved.

(MLA § 14.E.)

The license that Monopoly received under the MLA was nonexclusive.

(Def.'s Stmt. Undisp. Facts ("Def.'s SMF") ¶ 9.) The MLA provides that Hawthorn and its parent and affiliated companies could be competing with Monopoly in the Territory:

> Licensor [Hawthorn] or its parent, subsidiary, division, or affiliate may conduct any business activity or license other hospitality concepts in the Territory. Master Licensee [Monopoly] acknowledges

that Licensor [Hawthorn], its parent, subsidiaries, divisions, and affiliates are and may in the future be engaged in other business activities including activities involving transient lodging and related activities that may be, or that may be deemed to be, competitive with the Hotel System, both within and outside the Territory [.]

(*Id.*; MLA § 2.)

The MLA provides that there is no fiduciary relationship between Monopoly and Hawthorn:

A. <u>No Agency Relationship.</u> Master Licensee [Monopoly] is an independent contractor. Neither party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever. Licensor [Hawthorn] and Master Licensee [Monopoly] expressly acknowledge that the relationship intended by them is a business relationship based entirely on, and defined by, the express provisions of this Master Agreement and that no partnership, joint venture, agency, fiduciary, or employment relationship is intended or created by reason of this Master Agreement.

(Def.'s SMF ¶ 10; MLA § 13.A.)

Section 14.C of the MLA provides that "[t]his Master Agreement is exclusively for the benefit of the parties hereto and it shall not give rise to liability to a third party, except as otherwise specifically set forth herein." (MLA § 14.C.)

**Modifications to the Master License Agreement**

On November 4, 2002, Monopoly and Hawthorn entered into a First Addendum to License Agreement (the "First Addendum"). (Pl.'s Resp. SMF ¶ 17; MLA, First Addendum.) The First Addendum extended and reduced Monopoly's development schedule. (*Id.*) Under the extended development schedule set forth in the First Addendum, Monopoly was required to have executed two

agreements, and to have two hotels open and operating in the Territory, by the end of 2004. (Def.'s SMF ¶ 20; MLA, First Addendum; Deposition of John P. Mavrak as F.R.C.P. 30(b)(6) Designee for Monopoly Hotel Group, LLC ("Monopoly Dep.") Vol. 1, 120, Doc. 51.) For various reasons, Monopoly did not comply with its extended development obligations. (Def.'s SMF ¶ 19; Monopoly Dep. Vol. 1, 120-121.) At the end of 2004, Monopoly had signed only a single agreement[2] (for a hotel to be located in Bodrum, Turkey), and there were no hotels open and operating anywhere in the Territory.[3] (Def.'s SMF ¶ 20; Monopoly Dep. Vol. 1, 120-121.)

On November 7, 2002, Monopoly and Hawthorn entered into their Second Addendum to License Agreement (the "Second Addendum"). (Pl.'s Resp. SMF ¶ 18; MLA, Second Addendum.) The Second Addendum extended Monopoly's time to make the first and second installments on its Initial Franchise Fee to the second and third anniversaries of the execution of the MLA, respectively (i.e., to March 1, 2004 and March 1, 2005). (*Id.*) Monopoly failed to timely pay either the first or second $40,000 installments on its Initial Franchise Fee, which were due no later than March 1, 2004 and March 1, 2005. (Def.'s SMF ¶ 21; Monopoly Dep. Vol. 1, 145-147.) Hawthorne sent Monopoly a letter in August of 2004

---

[2] According to Mr. Mavrak, Monopoly had two signed contracts in October 2004 for hotels in Bulgaria and Turkey. (Declaration of John P. Mavrak ("Mavrak Decl.") ¶ 14.) The hotel in Bulgaria was outside Monopoly's licensed territory and Monopoly subsequently cancelled the Bulgaria contract when the owner failed to improve the property as a 4-star hotel. (*Id.*)

[3] In December 2004, Monopoly delivered design plans for a 5-star hotel in Bodrum, Turkey to USFS in Atlanta, which were approved by Mike Leven on behalf of Hawthorn. (Pl.'s Stmt. Undisp. Facts ("Pl.'s SMF") ¶¶ 12-13; Mavrak Decl. ¶ 15; Pl.'s Resp. SMF ¶ 49.) The Hawthorn Karaca Resort opened in Bodrum, Turkey on July 1, 2006. (Def.'s Resp. SMF ¶ 14; Mavrak Decl. ¶ 15; Pl.'s Resp. SMF ¶ 49.)

reminding it that it was in default as to the first installment payment and demanding payment of the overdue installment. (Def.'s SMF ¶ 22; Monopoly Dep. Vol. 1, 146-147.) Monopoly did not timely cure its default. (Def.'s SMF ¶ 22; Monopoly Dep. Vol. 1, 146-147.)

Under the MLA, the failure to comply with the Development Schedule is grounds for termination of the agreement. (Def.'s SMF ¶ 23; MLA §§ 3.A, 11.C.7; Monopoly Dep. Vol. 1, 147.) The MLA provides that "[a]ny failure by [Monopoly] to comply strictly with the Development Schedule shall constitute a material default hereunder, and shall entitle Licensor at is option, in its sole direction, to: (i) terminate this Master Agreement ... [or] (iii) reduce the size of the Territory, or any combination thereof." (*Id.*) The failure to pay monies due under the MLA is also grounds for termination of the MLA. (Def.'s SMF ¶ 24; MLA § 11.C.1(a).) Hawthorn did not terminate the MLA based on Monopoly's failures to comply with the Development Schedule and to timely pay the installments due on the Initial Franchise Fee. (Pl.'s Resp. SMF ¶ 25; Monopoly Dep. Vol. 1, 147-148.) Hawthorn also did not reduce Monopoly's Territory, as was its right. (Pl.'s Resp. SMF ¶ 25; MLA § 3.A.).

By letter dated March 15, 2005, Hawthorn notified Monopoly it was in breach of its development and financial obligations under the MLA. (March 15, 2005 Letter, Doc. 40-2 p. 125-26.) In the March 15th Letter, Hawthorn agreed to extend both the Development Schedule and the deadlines for payment of the Initial Fee installments, subject to Monopoly's acknowledgement of several

12

matters regarding the parties' rights and obligations under the MLA. (Pl.'s Resp. SMF ¶ 26; March 15, 2005 Letter, Doc. 40-2 p. 125-26.) The March 15, 2005 letter provides, in part, as follows:

> 1. For a variety of reasons, we [Hawthorn] cannot consider any projects outside the territory where you are licensed to act as our Master Licensee and, accordingly, you should not be pursuing them under any circumstances.
>
> ***
>
> 3. All projects you propose must be approved by us as required under the Master License Agreement. We will approve projects only if they are in your Territory, the projects meet our approval criteria and you provide us with any information we need to assist in the approval process. The approval process includes approval by the Approval Committee, which consists of representatives of Hawthorn and Hyatt. Hyatt now plays a more visible role in the approval process because, as the owner of Hawthorn, Hyatt has responsibility for, among other things, maintaining the integrity of the various brands within the Hyatt portfolio.

(*Id.*) The March 15th letter advised Monopoly that, if it acknowledged and agreed to these items going forward, it should let Hawthorn know by return e-mail, specifically referencing the March 15th letter. (*Id.*)

Monopoly did not respond to the March 15th terms in writing with its affirmative acceptance via return email as instructed. (Def.'s SMF ¶ 29; Mavrak Decl. ¶ 18.) However, on March 16, 2005, the day after the March 15, 2005 letter was emailed to Monopoly, Monopoly's principal, John Mavrak, sent a letter to Mr. Leven expressing his disappointment and dissatisfaction with his business relationship with Hawthorn/USFS. In the March 16th email, Mr. Mavrak states, among other things (i) that he understood that Hyatt wanted "to fully control the Hawthorn brand," (ii) that "[t]his should not ethically alter our agreement, nor

the way we had agreed I could develop or do business in my region, and the support I should expect from you," and (iii) that he "expect[s] to do many deals, with Hawthorns [sic] support, in the near future, and make millions of dollars." (Def.'s Resp. SMF ¶ 23; Doc. 128-2 at p. 63-66 (USFS949-952).) At the conclusion of the letter, Mr. Mavrak indicates that he will be sending a project in Dubai for approval and asked for Leven's opinion if properties like this are acceptable. (*Id.*)

Subsequently on March 22, 2005, Roy Flora, Executive VP of Franchise Operations of USFS (Hawthorn's parent company), sent Monopoly a follow-up letter "in an effort to help expedite the required approval process relative to any projects [Monopoly] may submit," and enclosed a "Hawthorn International Application Form," a "Committee Project Summary," and "a Third Addendum to License Agreement reflecting modifications to the Master Agreement pursuant to the March 15, 2005 Letter." (Doc. 61-6 at p. 98.) The letter advised Monopoly to use the forms for all future projects and asked Monopoly to execute the Third Addendum and return it to Hawthorn by March 31, 2005. (*Id.*) Unlike the first two addendums, the Third Addendum to the MLA contained a release of claims through the date of the execution of the addendum. (*Compare* MLA, Third Addendum *with* MLA, First Addendum *and* MLA, Second Addendum.)

After reviewing the release language in the Third Addendum, John Mavrak informed Roy Flora that he objected to the release and requested that it be removed from the addendum. (Mavrak Decl. ¶ 18, Ex. 9, March 27, 2005

Email, Doc. 65-10 at p. 7-8.)  Roy Flora and Mike Leven of Hawthorn advised Mr. Mavrak that the release was a mandatory condition to the execution of the Third Addendum.  (*Id.*)  Ultimately, Mr. Mavrak agreed to the inclusion of the release and executed the Third Addendum in April 2005.[4]  (Mavrak Decl. ¶ 18; Doc. 61-6 at p. 103.)  Mavrak also advised Roy Flora on the telephone that Monopoly agreed to the imposition of the Approval Committee for review of future applications.  (Mavrak Decl. ¶ 18.)

The Approval Committee consisted of three people, and did not have any written bylaws, procedures, standards, or guidelines, nor were there any formal meetings.  (Def.'s Resp. SMF ¶ 68.)  Originally, the Approval Committee consisted of Mike Leven and Roy Flora of Hawthorn/USFS and Michael Shindler, the Director of Development for Hyatt.  (Pl.'s Resp. SMF ¶ 46; Deposition of Roy E. Flora ("Flora Dep.") 24:21–25:6, Doc. 23.) Michael Shindler was replaced at some point by Jim Abrahamson of Hyatt.  (Flora Dep. 24:21–25:6.)  After Mr. Leven left Hawthorn/USFS's employ in late 2006 or early 2007, the Approval Committee was made up of Mr. Flora, Jim Abrahamson, and Rakesh Sarna of Hyatt.  (*Id.;* Def.'s Resp. SMF ¶ 69.)  From the time of Mr. Leven's departure from Hawthorn/USFS until July 2008 (when Wyndham acquired USFS), Mr. Flora acted as the Approval Committee's Chairman, which meant that he was

---

[4] The Third Addendum was executed by Hawthorn on June 3, 2005.  (MLA, Third Addendum.) The Third Addendum (i) extended the previously extended development schedule, (ii) extended (to July 31, 2005 and December 31, 2005) the dates by which Monopoly had to pay the second and third installments of its Initial Franchise Fee, and (iii) released Hawthorn and its parent corporations from liability for all claims through the date of the addendum.  (Pl.'s Resp. SMF ¶ 42; MLA, Third Addendum.)

Monopoly's contact on all development issues and "the focal point for [the] processing of issues that would have come before the committee." (Pl.'s Resp. SMF ¶ 47; Flora Dep. 43-45; Deposition of James Abrahamson ("Abrahamson Dep.") 26, 36, 102, Doc. 25.) During this time, the Approval Committee members reviewed and discussed development proposals on an ad hoc basis based on availability, generally, and travel schedules, and they were handled either in person between Mr. Abrahamson and Mr. Sarna who were both located in Chicago, and with Mr. Flora over the telephone or occasionally by e-mail. (Abrahamson Dep. at 25; Flora Dep. at 27; Deposition of Rakesh Sarna ("Sarna Dep.") 34-43, 47-49, 53, Doc. 27.)

According to Mike Leven, based on the terms of the March 15th Letter and during his tenure on the Approval Committee, both Hawthorn and Hyatt had authority to approve or disapprove Monopoly's development projects, "[b]ut the last gatekeeper was Shindler. So . . . if we [Hawthorn] approved it and Shindler [of Hyatt] turned it down, it was going to get turned down." (Deposition of Michael Leven ("Leven Dep.") 88, Doc. 29.) However, Mr. Leven testified that "if [Mr.] Shindler objected to [a deal], it's not that I would have gone along with it. If I thought it was appropriate – if I thought it was an inappropriate rejection . . . I would have gone above Shindler to [Doug] Geoga[5]." (Leven Dep. at 69, 89.) Mr. Leven also testified that he never had to go above Shindler because Shindler approved the deals. (Leven Dep. at 89.) According to Roy Flora, the Approval

---

[5] Doug Geoga was President of Global Hyatt Corporation and Hyatt Corporation.

Committee operated on a "one man, one vote" principle, and that the majority decision ruled. (Flora Dep. 26-27.) Mr. Abrahamson similarly testified that although "the committee didn't have any specific governance guidelines that would indicate whether or not majority ruled . . . it was [his] understanding of the committee that [they]'d reach a consensus of all three individuals in order to either approve or disapprove a project." (Abrahamson Dep. at 109-110.) Mr. Abrahamson further testified that "generally speaking if Mr. Sarna and [he] objected to a project, the likelihood is that it would not proceed." (Abrahamson Dep. 109-110.) Mr. Flora testified "if the two Hyatt guys" decided not to approve a project, there would have to be defined reasons for the denial and that he would evaluate those reasons. (Flora Dep. at 63.) He further testified that he could not recall that the Approval Committee made any decision that was not supported by all of its members. (Flora Dep. at 64.) However, Mr. Sarna did not recall ever being asked to decide whether to approve a Monopoly hotel development and that he simply offered verbal input as to the international market logistics for the proposed location of the hotel in a certain city or country. (Sarna Dep. at 35-43, 53, 75-76.)

### Proposals for Deira, Dubai; Hawally, Kuwait; and Turtle Bay, Northern Cyprus

On May 28, 2005, Monopoly executed a License and Management Agreement for a hotel in Deira, Dubai, United Arab Emirates and submitted an International Committee Project Summary to Hawthorn on the same date. (Pl.'s

Resp. SMF ¶ 50; Mavrak Decl., Exs. 10 & 11.) Prior to the approval of this proposal, Michael Shindler, Hyatt's then-representative on the Approval Committee, advised Monopoly that Hyatt's interests needed to be considered in assessing Monopoly's proposal. (Pl.'s Resp. SMF ¶ 50; Monopoly Dep. Vol. 1, 106:11-17; Mavrak Decl., Ex. 12.) On July 12, 2005, Monopoly was advised via email by Shindler that its Deira proposal had been approved by Hyatt. (Pl.'s Resp. SMF ¶ 51; Mavrak Decl. ¶ 21, Ex. 13.) At the time, there were two Hyatt-branded hotels operating in Dubai, and a third (The Park Hyatt Dubai) was under construction. (Pl.'s Resp. SMF ¶ 51; Monopoly Dep. Vol. 1, 200:12-24.) Monopoly's Deira hotel opened as a Hawthorn in December 2005 and was named International Hotel of the Year on March 31, 2008. (Pl.'s SMF ¶ 32; Mavrak Decl., ¶ 22, Ex. 14.)

On May 1, 2006, Monopoly executed a License and Management Agreement for a hotel to be located in Huwally, Kuwait and submitted an International Committee Project Summary to Hawthorn on the same date. (Def.'s SMF ¶ 52; Mavrak Decl. ¶ 23, Exs. 15-16.) On June 20, 2006, Roy Flora advised Mr. Mavrak that the Kuwait project was approved, and the hotel opened in January 2008. (Def.'s SMF ¶ 52; Mavrak Decl. ¶ 23; Doc. 40-2 at p. 377-379 (USFS 2131-33).)

On July 18, 2006, Monopoly executed a License and Management Agreement for a Hawthorn Turtle Bay Village Resort in the Turkish Republic of

Northern Cyprus and submitted an International Committee Project Summary to Hawthorn on the same date. (Pl.'s Resp. SMF ¶ 53; Mavrak Decl. ¶ 24, Exs. 18-19.) On August 1, 2006, Roy Flora advised Mr. Mavrak that "Hyatt gave the green light to proceed," with the project. (Pl.'s Resp. SMF ¶ 53; Mavrak Decl. ¶ 24, Ex. 20 (USFS 04390).) However, due to political turmoil between Cyprus and the Turkish Republic of Cyprus, Monopoly agreed with Mr. Flora's request to terminate the development on December 19, 2006, before the hotel opened as a Hawthorn. (Mavrak Decl. ¶ 24, Monopoly Dep. Vol. I, 456-59.)

### Proposals for World Trade Centers Holdings (Cyprus), Ltd.

On September 18, 2006, Monopoly executed a License and Management Agreement with World Trade Centers Holdings (Cyprus), Ltd. ("WTC Cyprus") for the development of a minimum of eight (8) hotels and suite residences in 5 countries. (Def.'s Resp. SMF ¶ 37; Mavrak Decl. ¶ 25, Ex. 21.) Three of the five countries encompassed by this development proposal (Algeria, Jordan and Libya) were outside of Monopoly's Territory. (Pl.'s Resp. SMF ¶ 56; Monopoly Dep. Vol. II, 380:19–381:5, Doc. 52.) On September 23, 2006, Monopoly submitted to Hawthorn the signed Agreement and a Committee Project Summary for the first 3 prospective hotels in: (i) Algiers, Algeria; (ii) Benghazi, Libya; and (iii) Casablanca, Morocco.[6] (Mavrak Decl. ¶ 26, Ex. 22.) Mr. Flora acknowledged receipt of this package by e-mail on September 27, 2006. (*Id.*, Ex. 25.)

_____

[6] According to the Declaration of John Mavrak, Monopoly also submitted a Design CD with mock-ups of the hotels. (Mavrak Decl. ¶ 26, Ex. 24, 27 (November 1, 2006 Email referencing submission of design CD sent previously with signed Agreement.) Hyatt disputes this fact,

After an email from Mr. Mavrak following up on the approval of the of the WTC Cyprus Agreement, Roy Flora responded on October 11, 2006 with a conditional approval of the agreement, noting that there was "some amendment language we'll have to discuss relative to the Master based on the development agreement. I'll have that in the morning. The only other issue is that each deal by defined location will have to be approved by the International Committee, which I will expedite as each are identified. We will also need to formally amend the Master to include Algiers, Libya & Jordan as they are not currently identified in your Master." (Def.'s Resp. SMF ¶¶ 37, 39; Mavrak Decl., Exs. 25, 26.)

On November 24, 2006, Hawthorn and Monopoly entered into a Fourth Addendum to the MLA (the "Fourth Addendum") that added the countries of Algeria, Jordan and Libya to Monopoly's Territory. (Pl.'s Resp. SMF ¶ 58; MLA, Fourth Addendum ¶ 1.) On December 5, 2006 and at Monopoly's behest, Roy Flora issued an approval letter to the WTC Cyprus developer, welcoming him to Hawthorne Suite family and noting "[t]he hotels that are proposed under the terms of the agreement with World Trade Center Holdings are exciting, in significant venues, and we look forward to working with you in the days and weeks ahead to see them come to fruition." (Mavrak Decl., Ex. 28.) On December 16 and 17, 2006, Monopoly again delivered design images for the prospective hotels in Algiers, Benghazi, Casablanca, and Doha, Qatar. (Def.'s Resp. SMF ¶ 40; Mavrak Decl., ¶ 30, Exs. 29-36.)

contending that no design images were submitted until December 16-17, 2006. (*See* Def.'s Resp. SMF ¶ 38.)

On March 5, 2007, John Mavrak wrote to Hawthorn and requested that Hawthorn issue a press release for the World Trade Center project. (Mavrak Decl., Ex. 42, Doc. 65-31 at p. 17.) In response, Roy Flora indicated that no press release would be issued until the project had been approved:

> John, consistent with our practice relative to all development related Press Releases, especially those relating to multi-unit agreements, we do not issue them until we have at least reviewed and approved one of the projects. This is the same practice we follow with other Master licensees throughout the world. While the WTC agreement has definite promise, we can't issue a press release until we receive from you a completed application and a signed Unit Agreement for at least one location for review by the International Franchise Committee. If approved, then we can announce, via press release, the signing of the specific deal and make mention at that time about additional development opportunities being contemplated by WTC located in venues such as ..... ~ I know at one time you were close to getting applications for us to review; can you give me an update? Once received, we will expedite the process. Thanks. REF

(*Id.* at p. 16-17.) Mr. Mavrak replied on March 7, 2007, that (1) Hawthorn had already approved the License Agreement for the World Trade Center project, (2) the designs for the three properties in Algeria, Casablanca, and Bengazi had already been submitted to Hawthorn, and (3) the developer had already signed an agreement to develop 8 hotel units such that individual Unit Agreements were unnecessary. (*Id.* at p. 16.) Mr. Mavrak accused Mr. Flora of having an agenda and requested that he review the information that had been in his possession for months and approve the projects. (*Id.*)

On March 9, 2007, Monopoly resent design graphics of the World Trade Center complexes for Algiers, Algeria; Benghazi, Libya; Casablanca, Morocco;

and Doha, Qatar to Hawthorn.  (Pl.'s SMF ¶ 41; Mavrak Decl., Exs. 43, 44.)  (Mavrak Decl., Ex. 45.)  On March 16, 2007, Roy Flora advised Mr. Mavrak that prior to approval, Hawthorn would require detailed development plans (in addition to the design images previously submitted), completed Internal Franchise Applications and Unit Agreements for each individual project under the WTC agreement.  (Mavrak Decl. ¶ 36, Ex. 48.)  On March 27, 2007, Mr. Mavrak met with Mr. Flora in Atlanta, Georgia and delivered hard copy designs and architectural drawings for the WTC Doha, Qatar.  (Mavrak Decl. ¶ 37.)

On April 2, 2007, in response to an email inquiry from Debbie Kennedy (Hawthorn/USFS) Monopoly provided the site address for the Algiers property and the pre-opening development office address for WTC Casablanca and WTC Benghazi.  Debbie Kennedy forwarded the information to Roy Flora on April 3, 2007 via email, noting "I've not rec'd any docs for this site yet (application or unit agrmt or site control) or the $5K app fee.  Should I request these now or not yet?"  (Def.'s SMF Tab 60, Doc. 40-3 at p. 89 of 158.)   Roy Flora instructed Ms. Kennedy to hold off: "I am waiting on a response from the International Committee as to whether they would give any consideration to discussions about these locations being Hyatt's.  They are clearly over the top for Hawthorn's."  (*Id.*)

On April 17, 2007, Roy Flora advised Monopoly that the International Franchise Committee (i.e., the "Approval Committee"), pursuant to Section 3(B) had rejected Monopoly's WTC proposal because the site plans provided (i) did not conform to the standards applicable to Hawthorn Suites hotels domestically

or internationally, and (ii) the proposed plans far exceeded what was required for the hotels to compete in their respective markets. (Pl.'s Resp. SMF ¶ 61; Def.'s Resp. SMF ¶ 42; Mavrak Decl., Ex. 61.) The letter further advises:

> We appreciate the time you have spent developing these plans for Hawthorn Suites properties. Indeed, the plans provided, while not in conformity with Hawthorn Suites standards, nevertheless present exciting opportunities as upscale full service hotels given the right branding and positioned in the proper segment. Therefore, if you agree, we will request that our affiliate, Hyatt International, consider the possibility of Hyatt Regency branding for these hotels under a Hyatt International Management Contract. If you are interested, we will request that Peter Norman, of Hyatt International, contact you to discuss this opportunity. Please note that should we proceed with the branding and management of any of the hotels under the "Hyatt" name, we would be willing to give you credit for such hotels under your current Master Licensee Development Schedule. Please let me know how you would like to proceed.

(Mavrak Decl., ¶38, Ex. 49.)

On April 24, 2007, Mr. Mavrak responded to the invitation to explore the option of pursuing the WTC hotels under the Hyatt Regency brand:

> I must be [] protected from Hyatt's dishonorable attempt to steal & ruin my business so they can take my contracted properties that I have worked hard for, and my license back without paying a penny after they have ruined me. My agreement is to develop the Hawthorn Brand and therefore build my company in doing so. I have no agreement with Hyatt......... No one on Hyatt should be on a committee to determine if a property meets my 4 & 5 star agreed standards. They are not fair judges ..... that is now a fact, and I do not accept their interference or your fraudulent ruling.

(Mavrak Decl., ¶38, Ex. 49a.) Mr. Mavrak further indicated his intent to take legal action in response to the Approval Committee's rejection of the WTC proposal. (*Id.*)

Two days later, on April 26, 2007, Mr. Flora responded to Mr. Mavrak's email and threat of litigation. (Mavrak Decl., Ex. 50.) Mr. Flora's letter indicated that Hawthorn might consider a request by Monopoly to modify the Hawthorn Hotel System policies, procedures, and standards pursuant to Section 4D of the MLA to encompass the proposed hotel projects for WTC Algiers, Casablanca, and Benghazi if sufficiently detailed information were provided in support of such request including an "analysis of why . . . these changes are necessary to comply with laws or commercial customs of the Territories in question [and] an analysis of the market in which [Monopoly] intend[s] to construct the hotels." (*Id.*) The letter also requests that Monopoly "provide this information for our review as soon as possible." (*Id.*) Mr. Flora reiterated this request for additional information on May 3, 2007. (Mavrak Decl., Ex. 51.)

After meeting with an attorney for Monopoly following the rejection of the WTC proposal, Mr. Flora advised Monopoly on June 5, 2007 that Hawthorn would reconsider the WTC projects in Algiers, Casablanca, and Benghazi upon receipt of the information requested in Mr. Flora's letters of April 26 and May 3, 2007. (Mavrak Decl., Ex. 54.) In response on June 6, although Mr. Mavrak disagreed with the need for more information, he agreed to provide additional information, but requested that Mr. Flora send him a detailed itemized list specific to each property of what information was required to approve the numerous deals submitted. (Mavrak Decl., Ex. 55.)

On July 2, 2007, Mr. Flora provided Monopoly with a list of the specific information required for reconsideration of the WTC projects, including a fill-in-the-blank "matrix" to show relative comparisons for each project/hotel. (Def.'s Resp. SMF ¶ 52; Mavrak Decl., Ex. 62.) Monopoly provided the information on July 14, 2007. (Def.'s Resp. SMF ¶ 53; Mavrak Decl., Ex. 63.) With respect to the request for modified standards for the Hotel System, Mavrak advised that the hotels meet the international standards he previously provided and approved under the MLA. (Id.; see also Mavrak Decl., Ex. 60

On July 25, 2007, Roy Flora submitted the WTC proposal for reconsideration to Jim Abrahamson and Rakesh Sarna (the two Hyatt representatives on the Approval Committee), along with the additional information provided by Monopoly and the completed matrix, indicating that for each of the locations — Algiers, Benghazi and Casablanca — "[b]ased on the clarification of the size and scope of the hotel itself [] the proposed hotel would seem to reasonably conform to the other hotels already open and operating in Deira and Bodrum, and soon to open in Hawally." (Tab 66, Def.'s SMF, Doc. 40-3 at p. 116-117.)

On or about August 6, 2007, Jim Abrahamson inquired via email of Roy Flora, "On Mavrak, we are still looking for the international standards documents which are part of his master license agreement, have they been found? I did not see any changes to the plans, are there any changes here?" (Ex. 69 to Flora Dep.; Doc. 61-3 at p. 106 of 123.) Mr. Flora responded, "Re: Mavrak, there are no

changes, just the clarification provided. We do not have a copy of the internal standards document and Mike has no recollection of where they are, if he even retained a copy. Based on conversations with our former International Sales person, who brought Mavrak to Mike, there were brief details of the standard to be employed which were consistent with what he built in Deira, Bodrum and Hawally. I will request another copy from Mavrak." (*Id.* at p. 105.) Jim Abrahamson then asked Mr. Flora if he recommended approving the projects: "Do I take it that you strongly recommend going with Mavrak deal? Is it consistent in your estimate of the intentions of the parties?" (*Id.* at p. 104.) He did:

> I was initially taken back and influenced negatively by the hotel as it was positioned within the context of the entire WTC complex. I believe we all were.
>
> Isolating it as if it were a stand alone and evaluating the exterior as well as the scope of the functional areas as they relate to Deira and Bodrum, I had a difficult time differentiating the hotel from what had been previously approved. And yes, the previously approved ones were consistent with what Mike believed to be the intention of the parties.
>
> I realize that these are tough calls in light of all that is presently going on, but if called upon to do so, we may have a challenging time denying them pursuant to the information provided by John for reconsideration, the enhanced terms of the original Master Agreement, and what the parties apparently believed to be the original intent (even though Mike never thought one would be built). Your thoughts, however, are still relevant.

(*Id.*) Mr. Flora testified in his deposition that his discussion in the third paragraph that "these are tough calls in light of all that is presently going on" was

a reference to the fact that he was in negotiations with Hyatt to explore the sale of USFS and the Hawthorn hotel brand to a third-party purchaser. (Flora Dep. 223-225.) Mr. Flora further testified that his use of the phrase "enhanced terms" of the MLA was in reference to the fact that "the form of the International Master License Agreement was enhanced through negotiation between Mike and John initially to, for example, allow the development of four-plus star hotels. That's not in the normal Master License Agreement, and certain other things in terms of the types of hotels which are delineated in the documents." (*Id.* at 225.)

Mr. Abrahamson initially responded that Hyatt had an issue with the WTC Casablanca hotel due to its positioning[7] in the market with respect to Hyatt's hotel in Casablanca. (Ex. 72 to Flora Dep.; Ex. 71 to Abrahamson Dep.) Mr. Flora advised that positioning with respect to a Hyatt hotel was not a proper license agreement consideration because "the agreement (which we all know is poorly amended and atypical) does not refer to any conditions of impact or any considerations of relativity to a Hyatt product. In my opinion, if we deny, would have to be for other reasons. Just trying to look at our decision based on the terms of the agreement." (Ex. 71 to Abrahamson Dep.)

After this back and forth between Mr. Flora and Mr. Abrahamson, Mr. Flora notified Mr. Mavrak on August 30, 2007 that the Approval Committee

---

[7] Mr. Abrahamson explained that "positioning" is an industry term and means "the relative market positioning of the hotel, not the location of the hotel. So positioning would be relative to whether it exists as a four-star or five-star or any star-related brand. So its representation and position in the market and its segmentation, not the geographic location." (Abrahamson Dep. at 121-122.)

approved the WTC projects for Algiers, Casablanca, and Benghazi "based solely on their merit and conformance to the enhanced terms of the Master Agreement." (Mavrak Decl., Ex. 66.) A formal approval letter was subsequently sent by Hawthorn on September 20, 2007. (Mavrak Decl., Ex. 68.) Following the approval of the WTC projects, the developer notified Monopoly of its desire to terminate its agreement with Monopoly in correspondence dated September 27, September 30, and October 12, 2007, in part, because of Hawthorn International's "extremely slow response in accepting the general design concepts for our first three multi-million dollar WTC complex developments in Algeria, Libya, and Morocco." (Mavrak Decl. ¶ 49, Exs. 69, 70, 71.) As a result the WTC hotel projects were never developed by Monopoly.

### Other Algiers Hotel Proposal

On May 29, 2007, Mehran Eftekhar (the WTC Cyprus developer), notified John Mavrak of an opportunity to convert two hotels in Algeria to Hawthorn hotels through a government tender. (Def.'s Resp. SMF ¶ 47; Mavrak Decl. ¶ 40, Ex. 53.) The deadline for submitting the tender of interest was June 11, 2007. (*Id.*) On June 5, 2007, Monopoly sought preliminary approval from Hawthorn in order to submit the tender of interest. (Mavrak Decl., Exs. 54-55.) Roy Flora responded that while he understood that Mr. Mavrak desired preliminary approval by June 11, due to travel schedules of its members, the Approval Committee was not able to convene prior to June 18 to review the proposal. (*Id.*) On June 8, 2007 Mr. Flora prepared a package for the Approval Committee's

review which was submitted to Mr. Abrahamson on June 11, 2007. (Mavrak Decl., Ex. 56; Def.'s Resp. SMF ¶ 48, Tab 48, Doc. 128-6 at 2.)  The request for preliminary approval was approved on June 25, 2007.  (Def.'s Resp. SMF ¶ 48, Tab 48, Doc. 128-6 at 2.)  By June 25, 2007, the opportunity no longer existed. (Pl.'s SMF ¶ 50.)

### Ras Al Khaimah and Sharjah

On March 18, 2007, Monopoly delivered notice that it entered into two new contracts: (i) a 120-room Hawthorn Suites in Sharjah, U.A.E.; and (ii) a 70-story World Trade Center in Ras Al Khaimah, U.A.E. (Def.'s Resp. SMF ¶ 57; Mavrak Decl., ¶50, Exs.72-76.)  On March 27, 2007, Monopoly submitted to Hawthorn the License & Management Agreements and Committee Project Summaries for its proposed developments in Sharjah and Ras Al Khaimah.   (Def.'s Resp. SMF ¶ 58.)  For the Ras Al Khaimah proposal, Monopoly submitted a "large glossy print design brochure" prepared by the architect for the project, and for the Sharjah proposal, Monopoly submitted exterior architectural renderings and design images of the proposed hotel. (Mavrak Decl. ¶ 51.)

On May 3, 2007, and after a month with no response from Hawthorn, John Mavrak wrote to Roy Flora to advise him that Monopoly deemed the Ras Al Khaimah and Sharjah projects approved pursuant to Section 14.E of the MLA. (Def.'s Resp. SMF ¶ 76; Mavrak Decl., Ex. 77.)  Mr. Flora promptly responded that the projects were not approved.  (*Id.*)  Mr. Flora advised Mr. Mavrak that, like the WTC proposal, the proposed Ras Al Khaimah and Sharjah projects "far

exceed what is required to compete in that market and are not consistent with any existing Hawthorn Suites hotel anywhere in the world." (Def.'s Resp. SMF ¶ 76; Mavrak Decl., Ex. 78.) Mr. Flora indicated that Hawthorn was "willing to further discuss [Monopoly's] interest in the proposed Hawthorn Suites hotel projects in Ras Al Khaimah and Sharjah, [but that] [Hawthorn] must be provided with the same analysis of the markets [Hawthorn] requested previously for the Algiers, Casablanca, and Benghazi projects before rendering a decision relative to same." (*Id.*)

Monopoly provided the requested information for Sharjah to Mr. Flora on July 2, 2007, and the development was approved on July 13, 2007. (Def.'s Resp. SMF ¶ 61; Mavrak Decl.,Ex. 79, 80.) On July 2, 2007, Mr. Flora decided not to submit the Ras Al Khaimah proposal to the Approval Committee. (Def.'s Resp. SMF, Tab 59; Flora Dep. at 215-16.) Instead, in an email dated July 3, 2007, Mr. Flora informed Debbie Kennedy, a member of his staff: "Just so you'll know, I'm not submitting Ras Al Khaimah. I have requested justification and analysis from John [Mavrak], due to what we believe to be an over-the-top project. I will send you a copy of my note to him yesterday." (*Id.*) Mr. Flora testified that he "made the decision to ask John [Mavrak] for additional justification and analysis before [Hawthorn] could process the application." (*Id.*) On July 14, 2007, Monopoly provided additional information on the Ras Al Khaimah proposal using Mr. Flora's market analysis matrix. (Mavrak Decl., Ex. 63.) Mr. Flora did not submit

the proposal for Ras Al Khaimah to Hyatt's representatives on the Approval Committee until October 1, 2007.  (Def.'s SMF ¶ 73; Def.'s Resp. SMF ¶ 62.)

Rather, on September 14, 2007, Mr. Flora informed Mr. Mavrak that he had an issue with the exterior pyramid design of the hotel and questioned whether it was "necessary and consistent with a hotel representing the Hawthorn hotel system."  (Mavrak Decl., Ex. 81.)  On September 19, 2007, Mr. Mavrak responded that the design of the hotel was determined by the client, met the four-star standard permitted under the MLA, and was not open for negotiation with the developer.  (Mavrak Decl., Ex. 82.)   He further complained regarding the delay in approval of the Ras Al Khaimah project, a pattern which began "when Hyatt entered the relationship" and stated "I did not enter into an agreement with Hyatt, but all direction is now coming from Chicago."  (*Id.*)

On September 21, 2007, Mr. Mavrak informed Roy Flora via email that he spoke with the developer for Ras Al Khaimah who gave him notice that they decided to terminate their development agreement with Monopoly due to the delay in approval and their desire to "move ahead with another more committed company."  (Mavrak Decl., Ex. 84.)  On October 8, Mr. Mavrak forwarded Mr. Flora a confirmation letter of Ras Al Khaimah's cancellation of their agreement. (Mavrak Decl., Ex. 85.)  Nonetheless, Mr. Flora informed Mr. Mavrak on October 22, 2007 that he secured approval of the Ras Al Khaimah development, "an approval which appears to be after-the-fact and quite probably a non-starter at this juncture."  (Mavrak Decl., Ex. 86.)  Mr. Flora shared his "regret that the

timing of [Hawthorn's] responses has not been what I would have desired them to be, nor you or your clients, and that WTC Holdings has now chosen not to pursue development of the hotels . . . in hopes that a reconciliation might be possible, albeit remotely." (*Id.*)

Some portion of the delay in getting approval for the Ras Al Khaimah hotel was due to the fact that Hyatt believed it had been negotiating with the same developer to convert the very same hotel to a Hyatt-branded hotel. (Def.'s SMF ¶ 74; Monopoly Dep. Ex. 56 (HYATT342-344).) On October 19, 2007, Hyatt learned that the entity that Monopoly was negotiating with (FAAB Establishment Real Estate Investment) was not the same entity with which Hyatt was negotiating. (Def.'s SMF ¶ 74; Doc. 40-4 at p. 11 (HYATT477).) Prior to the Approval Committee's belated approval of the Ras Al Khaimah development, Roy Flora advised Jim Abrahamson via email on October 19, 2007 that "Mavrak forwarded letter from clients expressing concern over time it takes for us to make a decision and are considering terminating their other deals approved at WTC locations. If they are now opening discussions with others, like Hyatt, could be sticky with Mavrak. Just my observation. Will be interesting what you learn. I will try to salvage previously approved deals." (Def.'s SMF Tab 74; Monopoly Dep. Ex. 56 (HYATT342-344).

**Termination of Monopoly Agreements**

Ultimately, only three hotels opened in Monopoly's licensed territory: in Deira, Dubai, in Huwally, Kuwait, and in Bodrum, Turkey. (Pl.'s Resp. SMF ¶ 81;

Monopoly Dep. Vol. I, 174.) Monopoly ultimately terminated the license agreements of all of these hotels because, among other things, the licensees failed to pay the fees due under their respective agreements. (Def.'s SMF ¶ 84; Monopoly Dep. Vol. I, 33-34.) On or about July 2008, Hyatt sold the assets of U.S. Franchise Systems, including Hawthorn's MLA with Monopoly to Wyndam. (Monopoly Dep. Vol. I, 91-92.) On May 10, 2010, Wyndham sent Monopoly a formal notice of termination of the MLA as a result of Monopoly's failure to cure its development and financial defaults by: (i) failing to pay over $107,000 in overdue fees, and (ii) failing to comply with the Development Schedule. (Def.'s SMF ¶ 85; Monopoly Dep. Ex. 14.) At the time the letter was sent, Monopoly had ceased operating any licensed hotels in 2009. (Monopoly Dep. Vol. I, 98-99.)

### Procedural Litigation History

In June of 2008, Monopoly filed a complaint against Hyatt Corporation, Global Hyatt Corporation, Roy Flora and USFS in the Superior Court of Gwinnett County for tortious interference with Monopoly's development efforts (the "State Court Litigation"). (Def.'s SMF ¶ 91; *see* Doc. 40-4 at 109-114; Doc. 140-1.) On August 13, 2010, Monopoly's claims against Hyatt Corporation and Global Hyatt Corporation were dismissed pending mandatory arbitration under the MLA. (Def.'s SMF ¶ 92; *see* Doc. 40-4 at 109-114; Doc. 139-3.) On August 19, 2011, Monopoly entered into a Confidential Settlement Agreement with Mr. Flora, USFS, Hawthorn, and Wyndham, whereby it released those entities from all claims which were or could have been asserted in the State Court Proceeding.

(Def.'s SMF ¶ 93; Doc. 47 (filed under seal).) On September 5, 2011, Monopoly submitted a Request and Demand for Arbitration against Hyatt Hotels Corporation to the International Chamber of Commerce. (Def.'s SMF ¶ 94; Monopoly Dep. Ex. 54.) By agreement, that Arbitration Demand was withdrawn and Monopoly re-filed its claims against Hyatt in this Court on April 12, 2012. (Def.'s SMF ¶ 94; Submission Agreement.) The case was re-assigned to the undersigned judge on December 10, 2014.

## III. Choice of Law

The parties agree and request that this Court apply Georgia law to Plaintiff's claims for breach of contract and breach of fiduciary duty in this dispute between Plaintiff (a Florida limited liability company whose sole member is a U.S. citizen permanently domiciled in England) and Defendant (a Delaware corporation with its principal place of business in Illinois). The underlying agreement at the heart of this dispute, Plaintiff's Master License Agreement with non-party Hawthorn International, Inc. (a Georgia corporation), provides that the Agreement "shall be deemed made and entered into in the state of Georgia and shall be governed and construed under and in accordance with the laws of the state of Georgia," (Doc. 1-1 at 30). Accordingly, the Court will apply Georgia law.

## IV. Analysis

Hyatt asks this Court to find that it had no contract with and owed no fiduciary duty to Monopoly by virtue of its participation in the approval of

Monopoly's projects under the MLA with Hawthorn.[8]  In support of its motion on

Monopoly's breach of contract claim, Hyatt asserts that Monopoly's contract was

with Hawthorn and that Monopoly has failed to establish any of the essential

elements of contract formation between Hyatt and Monopoly.  As for Monopoly's

breach of fiduciary duty claim, Hyatt argues that there was no fiduciary

relationship between Monopoly and Hyatt arising either from the MLA or the

business nature of their relationship.

Monopoly contends, in its own motion, that it is entitled to partial

summary judgment as to both the existence of a contract between it and Hyatt

and a material breach of the contract.  Monopoly asserts that a contract exists

between it and Hyatt because: (1) the March 15, 2005 letter was sent by Mike

Leven at Hyatt's behest; (2) Monopoly agreed to the replacement of Hyatt for

Hawthorn as the entity bound and responsible for approving or disapproving

franchise and site selection as a condition for extending the terms under the

MLA, and (3) Hyatt did in fact control the approval process.  Monopoly asserts

that Hyatt breached its obligations under the contract by unreasonably delaying

its approval decisions and rejecting certain of Monopoly's development proposals

for invalid reasons.  In opposition to Hyatt's motion on the breach of fiduciary

---

[8] In the event the Court were to find a contract between Hyatt and Monopoly did exist, Hyatt argues that: (1) Monopoly's contract claim is barred by the statute of frauds; (2) Monopoly cannot establish a breach of the alleged contract because all hotel proposals were ultimately approved; and (3) Monopoly's claimed damages for lost profit are wholly speculative.  And, in the event the Court were to find that Hyatt did owe a fiduciary duty to Monopoly, Hyatt's ultimate approval of each of the projects bars a claim for breach of that duty.

duty claim, Monopoly contends that whether a fiduciary duty existed is a fact question to be determined at trial.

### A. Count I - Breach of Contract: Whether there was a contract between Monopoly and Hyatt

Hyatt asserts that the record conclusively establishes that no contract was ever formed between Monopoly and Hyatt. This is so, Hyatt contends, because there was no offer or acceptance, no mutual assent as to all material terms, and no consideration between Hyatt and Monopoly.

The Georgia code defines a contract as "an agreement between two or more parties for the doing or not doing of some specified thing." O.C.G.A. § 13-1-1. In addition, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1.

Under Georgia law, "[a]s a general rule, an action on a contract, . . . shall be brought in the name of the party in whom the legal interest in the contract is vested, and against the party who made it in person or by agent." O.C.G.A. § 9-2-20(a). "O.C.G.A. § 9-2-20(a) sets forth a succinct yet comprehensive rule as to proper parties in an action ex contractu." John K. Larkins, Jr., *Georgia Contracts: Law and Litigation*, § 12.2 at 342 (2d. ed. 2015). In other words, "one may not be sued for breach of a contract which does not name him and which he has not executed." *Contractors Mgmt. Corp. v. McDowell-Kelley, Inc.*, 220

S.E.2d 473, 475 (Ga. Ct. App. 1975). "[I]t is axiomatic that a person who is not a party to a contract is not bound by its terms." *Primary Investments, LLC v. Wee Tender Care III, Inc.*, 746 S.E.2d 823, 827 (Ga. Ct. App. 2013) (citing *Kaesemeyer v. Angiogenix, Inc.*, 629 S.E.2d 22 (Ga. Ct. App. 2006) and *Accurate Printers, Inc. v. Stark*, 671 S.E.2d 228, 231 (Ga. Ct. App. 2008) (finding that a corporation that was not a party to asset purchase agreement entered into by its owner in his individual capacity could not pursue a claim for its breach because "[i]t is axiomatic that each corporation is a separate entity, distinct and apart from its stockholders").

Hyatt is correct, and Monopoly does not dispute, that there is no written contract negotiated between and signed by and between Hyatt and Monopoly. (Pl.'s Resp. SMF ¶ 31; Monopoly Dep. Vol. I, 152.) As it is clear that Hyatt did not contract directly with Monopoly, the issue before the Court is whether Hyatt is otherwise liable to Monopoly as a non-party to the MLA.

In support of its breach of contract claim, Monopoly advances two alternative legal arguments: first, Hyatt replaced Hawthorn as the party obligated to approve or disapprove Monopoly's hotel proposals, and although not a signatory to the contract, Hyatt was bound by the terms of the MLA related to those decisions, (Pl.'s Mot. at 15-19; Pl.'s Resp. at 13-16); and second, the terms of the March 15th letter were conveyed by Mike Leven (Hawthorn's CEO) as an agent for Hyatt, and because Mr. Leven had apparent authority to convey the

offer on behalf of Hyatt, Hyatt is estopped from disavowing his acts as its agent, (Pl.'s Reply at 3-4).

### 1. Whether Monopoly Assented to the Terms of the March 15th Letter

Plaintiff, as the party asserting the existence of a contract with Hyatt, has the burden of proving the existence and terms of the contract. *E.g., Millwood v. Art Factory, Inc.*, 702 S.E.2d 7, 9 (Ga. Ct. App. 2010). To carry this burden, plaintiff must show "every necessary essential of a valid contract." *Associated Mutuals v. Pope Lumber Co.*, 37 S.E.2d 393, 396 (Ga. 1946). Offer and acceptance, the two halves of mutual assent, are essential elements of contract formation. *See* John K. Larkins, Jr., Georgia Contracts: Law and Litigation, § 3.1 at 50 (2d. ed. 2015).

Setting aside for the moment whether Hyatt or Hawthorn was the offeror behind the March 15th letter, the Court first addresses Hyatt's half-hearted lack of assent argument. Despite Hyatt's argument that Monopoly never accepted the terms of the March 15th letter, the parties' course of conduct demonstrates otherwise.

The March 15th letter dictates the manner of acceptance in the form of a return email from Mr. Mavrak acknowledging and accepting its terms. No such email exists in the record. Monopoly did not respond to the March 15th terms in writing with its affirmative acceptance via return email as instructed. (Def.'s SMF ¶ 29; Mavrak Decl. ¶ 18.) Instead, the following day on March 16, 2005, Mr.

Mavrak, sent via email a letter to Mr. Leven expressing his disappointment and dissatisfaction with his business relationship with Hawthorn/USFS. In the March 16th email, Mr. Mavrak states, among other things (i) that he understood that Hyatt wanted "to fully control the Hawthorn brand," (ii) that "[t]his should not ethically alter our agreement, nor the way we had agreed I could develop or do business in my region, and the support I should expect from you," and (iii) that he "expect[s] to do many deals, with Hawthorns [sic] support, in the near future, and make millions of dollars." (Def.'s Resp. SMF ¶ 23; Doc. 128-2 at p. 63-66 (USFS949-952).) Mr. Mavrak concluded the letter by indicating that he would be seeking a approval for a hotel in Dubai. (*Id.*) Though the email does not contain Mr. Mavrak's express consent, it is fairly implied as confirmed by the parties' subsequent communications.

Mr. Mavrak attests that he objected to Hyatt's participation in an Approval Committee, but was advised that it was a required condition to extending the payment and development schedule, and ultimately conveyed his acceptance to Mr. Flora via telephone. As a result, Hawthorn did not terminate the MLA as indicated was its right in the March 15th letter. Instead, Hawthorn forwarded Mr. Mavrak new forms to use going forward when submitting any development proposals, including an International Committee Project Summary form. Monopoly utilized the required International Committee Project Summary forms for each development proposal submitted for review after March 15, 2005.

In April, 2015, Mr. Mavrak executed a Third Addendum to the MLA that extended Monopoly's payment and development schedules as contemplated by the March 15th letter. The Third Addendum does not, however, contain any of the other terms/modifications contemplated by the March 15th letter — specifically the imposition of an Approval Committee that includes representatives of Hyatt. Paragraph 4 of the Third Addendum provides "[e]xcept as expressly stated in this Third Addendum, no further additions, modifications or deletions to the Agreement are intended by the parties or made by this Third Addendum . . . Unless otherwise modified herein, all other terms and conditions of the Agreement remain in full force and effect." The Third Addendum was signed by Roy Flora on behalf of Hawthorn effective June 3, 2005. Although the MLA was never formally amended to incorporate the use of an Approval Committee, it is undisputed that an Approval Committee was formed, that it consisted of representatives of both Hawthorn and Hyatt, and that the committee (with Hyatt's representatives in the majority) did in fact review and approve Monopoly's franchise/development proposals in a gate-keeping capacity.

Georgia law generally provides that an "offer must be accepted in the manner specified by it; and if it calls for a promise, then a promise must be made; or if it calls for an act, it can be accepted only by the doing of the act." *E.g., Kitchens v. Ezell*, 726 S.E.2d 461, 465 (Ga. Ct. App. 2012). It is also true that "performing under the contract constitutes acceptance of the offer." *State v. U.S. Oil Co.*, 389 S.E.2d 498, 499 (Ga. Ct. App. 1989); *see also Caley v. Gulfstream*

*Aerospace Corp.*, 428 F.3d 1359, 1374 (11th Cir. 2005). And "assent may be implied from the circumstances, [] and the conduct of the parties." *Thomas v. Chance*, 754 S.E.2d 669, 671 (Ga. Ct. App. 2014) (internal citations omitted).

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent . . . the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement.

*Turner Broad. Sys., Inc. v. McDavid*, 693 S.E.2d 873, 878 (Ga. Ct. App. 2010) (citations omitted). Where such evidence exists and is undisputed, the court may properly determine the question of whether a party has assented to the contract based on the circumstances and the conduct of the parties. *Cf. id.* Hyatt does not dispute the basic facts surrounding the parties' course of conduct following the March 15th letter, and instead offers these very same facts in support of its own motion. Thus, the record unquestionably demonstrates Monopoly's acceptance of the March 15th letter's condition that all further projects be approved by a committee made up of representatives of both Hawthorn and Hyatt.

### 2. Whether Hyatt is an Imputed Party Bound by the Terms of the MLA and the March 15th Letter

Hyatt is not a named party to the MLA, and there is no formal Addendum executed by the named parties substituting Hyatt in the place of Hawthorn as the responsible licensing entity under the MLA. Still, Monopoly seeks to hold Hyatt

liable for over $100,000,000 in economic losses Monopoly allegedly suffered as a result of Hyatt's failure to approve its hotel projects and Hyatt's delay in approving Monopoly's projects by virtue of Hyatt's control over the approval process. Monopoly has failed to demonstrate a sufficient legal basis for its contract claim.

a.     Principal-Agent Theory

Under one theory, Monopoly asserts that the March 15th letter was an offer by Hyatt, through Mike Leven, as its agent. Professing to rely on "rudimentary principles of principal-agent law," Monopoly cites only a single case in arguing that Hyatt is estopped from disavowing Leven's apparent authority to convey the offer on Hyatt's behalf. *See Nat'l Homes, Inc. v. City Plumbing & Heating Supply Co.*, 133 S.E.2d 416, 418 (Ga. Ct. App. 1963) ("[T]he authority of an agent [] may be established by the principal's conduct and course of dealing, and if one holds out another as his agent, and by his course of dealing indicates that the agent has certain authority, and thus induces another to deal with his agent as such, he is estopped to deny that the agent has any authority which, as reasonably deducible from the conduct of the parties, the agent apparently has.")(citations omitted). But as Hyatt points out, it is well-settled that "the conduct of the agent alone cannot bind the principal," and apparent authority can only arise "based on the principal's conduct" toward third parties. *Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc.*, 44 F. Supp. 2d 1348, 1355 (N.D. Ga. 1998) (citing *Bresnahan v. Lighthouse Mission, Inc.*, 496 S.E.2d 351, 353-354 (Ga. Ct. App. 1998)).

Indeed, the "apparent or ostensible agency theory focuses on the actions of the principal rather than the agent." *McGuire v. Radisson Hotels Intl.*, 435 S.E.2d 51, 53 (Ga. Ct. App. 1993) (finding that franchisor was not liable for negligence of franchisee by virtue of franchisor/franchisee relationship) (internal citations and quotations omitted); *Fed. Paper Bd. Co. v. Harbert-Yeargin, Inc.*, 92 F. Supp. 2d 1342, 1351 (N.D. Ga. 1998) ("[I]t is the principal's conduct that is crucial to the creation of apparent or ostensible authority."). "In order to recover under that theory, [] a plaintiff must present evidence that: (1) the apparent principal represented or held out the apparent agent; and (2) justifiable reliance upon the representation led to the injury." *Id.* "Apparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has." *Bresnahan*, 496 S.E.2d at 354; *Synergy Worldwide,* 44 F. Supp. 2d at 1355. "It is not enough that [the] plaintiff simply believe there is an agency relationship. There is an objective standard. The apparent principal must represent or hold out the apparent agent." *McGuire*, 435 S.E.2d at 53. "In other words, apparent authority is not predicated on whatever a third party chooses to think an agent has the right to do, or even upon what the agent says he can do, but must be based on acts of the principal which have led the third party to believe reasonably the agent had such authority." *Holy Fellowship Church of God in Christ v. Brittain*, 523 S.E.2d 93, 95 (Ga. Ct. App. 1999). Where there is no manifestation of authority by the principal to a third party, apparent authority is not in issue.

*Gosule v. Bestco, Inc.*, 490 S.E.2d 532, 534 (Ga. Ct. App. 1997) (citing *Morris v. Williams*, 448 S.E.2d 267 (Ga. Ct. App. 1994)).

Monopoly has pointed to no conduct on behalf of Hyatt which reasonably led Monopoly to believe that Mr. Leven had apparent authority to create a new contract binding Hyatt to the terms of Hawthorn's franchise license agreement with Monopoly. Monopoly's principal, John Mavrak, admits he never communicated with anyone at Hyatt prior to agreeing to the terms of the March 15th letter in exchange for an extension of his financial and development obligations under the MLA. (Monopoly Dep. Vol. I, 145-179.) Mr. Leven was CEO of U.S. Franchise Systems and its subsidiary, Hawthorn International, Inc. (Leven Dep. 61; MLA.) He did not hold any officer position with Hyatt. (Leven Dep. 61.) Monopoly does not contend, and there is no evidence in the record that indicates that Hyatt ever held out Mr. Leven as Hyatt's agent. The only evidence Monopoly relies on is Mr. Leven's deposition testimony that:

> Q But in terms of March 15th, 2005, letter, this approval committee including Hyatt people and maintaining the integrity of the various prints in the Hyatt portfolio that definitely came from a Hyatt person, not you or Roy in terms of imposing that condition?
>
> THE WITNESS: I can't tell you where it came from. Under normal circumstances it would have come from us, not from Hyatt. I'm sorry. It would have come from Hyatt, not from us.

(Leven Dep. at 61.) In essence, Monopoly asks this Court to bind Hyatt to the terms of Hawthorn's MLA on pure speculation that Hawthorn (via its CEO Mike Leven) acted as Hyatt's agent in conveying the terms of the March 15th letter.

Monopoly's assertion that Leven was Hyatt's agent is entirely conclusory and is based solely on Hyatt's ownership interest in Hawthorn. This mere fact, however, is insufficient to raise a triable fact issue under Georgia law:

> There is no question that under appropriate circumstances a parent corporation can set up a subsidiary to promote the parent's purposes yet maintain a separate identity from the subsidiary and avoid liability for the subsidiary's actions. A parent/subsidiary relationship does not in and of itself establish the subsidiary as either the alter ego of the parent or as the parent's actual or apparent agent.

*Kissun v. Humana, Inc.*, 479 S.E.2d 751, 754 (Ga. 1997) (citations omitted); *Matson v. Noble Inv. Group, LLC*, 655 S.E.2d 275 (Ga. Ct. App. 2007). But "where the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such agency exists." *Shivers v. Sexton*, 296 S.E. 2d 490, 491 (Ga. Ct. App. 1982); *Borg–Warner Acceptance Corp. v. Davis*, 804 F.2d 1580, 1583 (11th Cir. 1986) ("It is insufficient, as a matter of law, to find that an agency relationship exists when the evidence shows either that an agency was assumed, or that an inference was drawn based on a purported agent's actions.").

Therefore, because the principal's conduct, not the agent's, is the key to the apparent agency theory, Hyatt is entitled to summary judgment on the issue of apparent authority, absent evidence of "holding out" on the part of Hyatt, or specific acts by Hyatt creating the appearance of such authority. *See Matson*, 655

S.E. 2d at 281-82 (finding trial court properly granted summary judgment to parent company Hilton on plaintiff's claim that franchise licensor was liable as Hilton's agent based solely on nature of business relationship, absent any other evidence of an agency relationship between the companies); *McGuire v. Radisson Hotels*, 435 S.E.2d at 53-54 (affirming summary judgment where "[a]ppellant points to no other evidence of "holding out" on the part of appellee, and [court] already determined that agency was not created by the franchise agreement"); *Bresnahan v. Lighthouse Mission*, 496 S.E.2d at 353-54 (finding trial court did not err in granting summary judgment in favor of principal when evidence undisputed that principal never held out alleged agent "as anyone who, on her sole signature, could bind the corporation"); *Holy Fellowship Church of God in Christ v. Brittain*, 523 S.E.2d 93, 95 (Ga. Ct. App. 1999) (finding third party failed to raise an issue of fact when third party did not assert any act or statement by principal that would cause third party to believe that an alleged agent had authority to make the agreement); *Holcomb v. Commercial Credit Servs. Corp.*, 349 S.E.2d 523, 524 (Ga. Ct. App. 1986) (finding no question of fact existed as to the existence of an agency relationship between vendor and credit company where evidence on summary judgment was that purchaser had not had any discussions with the credit company concerning the purchase of the equipment prior to the execution of the lease/purchase agreement but that his only such discussions had been with vendor such that existence of agency relationship was based solely on conjecture).

### b.    Ratification/acceptance of benefits theory

Under its second theory, Monopoly asserts that Hyatt became bound by (and therefore liable for breach of) the MLA by virtue of its replacement of Hawthorn as the party obligated to approve or disapprove Monopoly's hotel proposals.  In support of this theory, Monopoly cites two cases and only for the general proposition that a non-party to a contract may "become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other."  (Pl.'s Mot. at 17-18 & Pl.'s Resp. at 15 (citing *Comvest v. Corporate Securities Group, Inc.*, 507 S.E.2d 21 (Ga. Ct. Ap. 1998) and *Atwater v. NFLPA*, Civ. Act. No. 1:06-CV-1510-JEC, 2009 U.S. Dist. LEXIS 98236, *31 (N.D. Ga. March 26, 2009) (Carnes, J.)).  As explained below, these cases bear no comparison to the circumstances in this case nor do they support a finding that a contract existed between Monopoly and Hyatt as a matter of undisputed fact or law.

In *Comvest*, the Georgia Court of Appeals found that a purchaser of securities was bound by an arbitration clause in a customer agreement that was sent to the purchaser but never signed.  507 S.E.2d at 24-25.  Plaintiff Comvest, an investment corporation through its president, attorney Marvin Nodvin, purchased $2,052 in units of stock in November 1994 from representatives of defendants Corporate Securities Group, Inc. (CSG), J.W. Charles Securities, Inc. (JWCS), and J.W. Charles Clearing Corporation (JWCCC).  *Id.* at 22.  Comvest

subsequently sued the defendants based on allegations of fraud in the sale of the securities, and the defendants moved to compel arbitration. *Id.* The defendants presented evidence that upon opening of the customer account, a customer agreement containing an arbitration provision was mailed to Nodvin. *Id.* at 22-23. According to the evidence, CSG's policy required that all customers sign a customer agreement, although CSG allowed "its clients as a courtesy to place an initial transaction order at the time the account is opened and before the customer agreement is returned by the customer." *Id.* at 23. The defendants presented further evidence that in December 1994, the documentation department determined that the customer agreement for the Comvest account was not on file, and defendants mailed a second copy of the customer agreement to Nodvin with a request that it be signed and returned to CSG. *Id.* The Comvest account was also placed on restricted status and prohibited from further trading. *Id.* Defendants submitted affidavit testimony that Nodvin purchased the securities with knowledge of the industry practice requiring the submission of customer/broker disputes to arbitration, based on his own securities purchasing history. *Id.* at 23-24. On appeal, the court determined that "the evidence supported findings that the customer agreement was mailed to and received by Nodvin and that he knew it was standard practice for brokerage firms to require customers to submit disputes to arbitration." *Id.* The court further held that Comvest was bound by the arbitration clause, finding that "Comvest ratified the

contract through its retention of the securities for over one year before bringing suit."[9]  *Id.* at 25.

In *Atwater*, several former National Football League players, the spouse of one of the players, and several investment entities controlled by them sued the National Football League ("NFL") and the National Football League's Players Association ("NFLPA").  2009 U.S. Dist. LEXIS 98236, at *3.  The football player plaintiffs paid annual dues and were members of the NFLPA, which offers a number of programs and services to its members, including the Financial Advisors Program.  *Id.* at *4-5.  One of the services provided under the Financial Advisors Program was access to a list of pre-screened, "registered" financial advisors that players could contact for financial and other investment advice.  *Id.* at *5.  After two such advisors, through a combination of bad investments and theft, dissipated $20 million invested by the plaintiffs, the plaintiffs then filed suit against the NFL and the NFLPA, for negligence, negligent misrepresentation and breach of fiduciary duty, claiming that the NFL breached its duty to the plaintiffs by negligently performing background checks on financial advisors who participated in the NFLPA's Financial Advisors Program, and that the NFLPA

---

[9] On appeal, Comvest also contended that it was only bound to arbitrate controversies with JWCCC, because that corporation and Comvest are the only parties to the agreement allegedly mailed to Comvest.  The Court of Appeals disagreed, finding that Comvest acknowledged that CSG and JWCS were alter egos of JWCCC and "[n]on-signatory business entities are covered by arbitration agreements entered into by corporations which are their alter egos."  *Id.* at 25 (citing *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1122 (3rd Cir. 1993).  As explained further below, Monopoly does not assert or provide evidence in any of its summary judgment submissions that Hawthorn was the alter ego of Hyatt.

breached its corresponding duty to exercise due care in administering that program. *Id.* at *8-9.

In addition to being preempted under section 301 of Labor Management Relations Act, the district court in *Atwater* found that the plaintiffs' claims against the NFLPA were barred by the language of a disclaimer in the NFLPA's Financial Advisors Program Regulations, stating that:

> [t]he NFLPA is not endorsing any Registered Player Financial Advisor and is not responsible for, and disclaims, any liability for the acts or omissions of any Registered Player Financial Advisor. The NFLPA is also not responsible for, and makes no representation concerning, the skill, honesty, or competence of any Registered Player Financial Advisor, or any other person.

*Id.* at *29-30. The court concluded that by joining the NFLPA, the plaintiffs entered into a contract and agreed to be bound by the terms of the NFLPA contract documents containing the disclaimer. *Id.* at *30-31 (citing *United Ass'n of Journeymen & Apprentices of Plumbers & Pipefitters Indus. v. United Assn of Journeymen & Apprentices*, 452 U.S. 615 (1981) ("the prevailing state-law view is that a union constitution is a contract") and *Int'l Union of Elec. Workers v. Statham*, 97 F.3d 1416, 1421 (11th Cir. 1996) (involving a suit brought by a union to enforce the union constitution as a contract)). In addition, the court found that by paying "substantial annual dues to the NFLPA for the various services and benefits the NFLPA provides to its members," the plaintiffs: "(1) continued to manifest consent to the NFLPA Constitution and regulations; and (2) exchanged consideration under the contract with the NFLPA." *Id.* (citing *Comvest,* 507

S.E.2d 21 (noting that parties may become bound "by the acceptance of benefits under [a] contract, or the acceptance by one of the performance by the other").)

Monopoly makes no attempt to draw any parallel to either *Comvest* or *Atwater* as support for its contention that Hyatt manifested its consent to be liable for any alleged breach of the MLA relating to the failure of Monopoly's hotel deals. Nor can the Court reasonably draw one. Monopoly further fails to offer any authority to support its position that a parent company may become contractually liable to a third party because of its role in the decision making of its subsidiary. (*See* Def.'s Resp. at 11; Def.'s Reply at 4 (noting Monopoly's failure to point to authority "for the proposition that a new contract springs into existence simply because a parent corporation instructs a subsidiary to engage in certain actions with respect to contracts the subsidiary enters into with third parties"). Instead, Monopoly contends that because Hyatt exercised control over the approval process, "the undisputed material facts in the record show affirmatively that a contract did in fact exist such that <u>Monopoly</u> is entitled to summary judgment on that issue." (Pl.'s Resp., Doc. 60 at 16.)

In response to Monopoly's contract theory, Hyatt asserts that to the extent the March 15th letter modified the preexisting approval process, that modification resulted solely in an amendment of the MLA that Monopoly entered into with Hawthorn. Hyatt denies there is any basis for finding that the March 15th letter resulted in the formation of an entirely new contract between Monopoly and Hyatt or that any such contract "had the corollary impact of

effectively excising from the MLA the entire approval process." (Def.'s Resp., Doc. 127 at 12.)

Hyatt's argument is twofold - that Monopoly's "replacement" contract theory is both legally unsupported and factually untenable. Hyatt first argues that if Monopoly's theory is correct that the March 15th letter constituted a separate contract with Hyatt, under Georgia law there must be some record evidence establishing that Hawthorn (the party originally charged with franchise approvals) had been released from that specific contractual obligation. *See Litland v. Smith*, 543 S.E.2d 468, 470 (Ga. Ct. App. 2000) ("In order for a promise to be considered an original undertaking, the new promisor, for valuable consideration, must substitute himself as the party who is to perform, and the original promisor must be released."); *see also Contractors Mgmt. Corp. v. McDowell-Kelley, Inc.*, 220 S.E.2d 473, 476 (Ga. Ct. App. 1975) (The agreement to substitute a third party for one of the nominal parties to the contract is a separate contract, having as its consideration the release of one of the nominal parties from his obligations on the original contract. This was not strictly a modification of the original contract. Moreover, such an agreement must be supported by valuable consideration.") According to Hyatt, there is no such evidence in this case and in fact, the only evidence of any release of Hawthorn came years into the original inception of this litigation in state court when

Monopoly entered into a Confidential Settlement Agreement with USFS, Hawthorn and Wyndam.[10]  (*See* Doc. 47 at 58-66.)

Hyatt also argues that to the extent the March 15th letter constituted a separate contract with Hyatt, it lacked sufficient consideration separate and apart from that which formed the basis of the original/former contract with Hawthorn. In response, Monopoly contends its agreement to the conditions imposed by the March 15th letter in exchange for an extension of the development and payment deadlines under the MLA constituted adequate consideration. As the "Licensor" under the terms of the MLA, Hawthorn was the sole entity responsible for approving Monopoly's hotel franchise proposals.  (*See* MLA §§ 3.B & 3.C.)  The MLA did not expressly provide for Hyatt to have any approval authority over Monopoly's proposals.  According to Monopoly, Hyatt could not control franchise and site selection pursuant to the MLA and Hawthorn could not delegate those duties without Monopoly's agreement and consent.  In return for allowing Hyatt to have direct involvement in the approval process, a benefit which Hyatt did not otherwise enjoy, Monopoly received relief from its default via a relaxed payment and development schedule.  Thus, Monopoly's acceptance of Hyatt's participation on an Approval Committee, as a condition for the continuation of the parties' business relationship going forward, was sufficient as additional consideration to support a separate contract with Hyatt.  Therefore, the Court agrees that this *quid*

---

[10] The Court notes that under the terms of the Third and Fourth Addendums to the MLA, Monopoly agreed to a general release of claims against Hawthorn as of the date of those contract amendments.

*pro quo* would constitute consideration under Georgia law. *See Pepsi Cola Bottling Co. of Dothan, Alabama v. First Nat. Bank of Columbus*, 281 S.E.2d 579, 581 (Ga. 1981) ("Any benefit accruing to him who makes the promise, or any loss, trouble, or disadvantage undergone by, or charge imposed upon, him to whom it is made, is sufficient consideration....") (citation omitted); *Franklin v. UAP/GA. AG. CHEM, Inc.*, 514 S.E.2d 241, 243 (Ga. Ct. App. 1999) (stating that "slight consideration" suffices to support a contract). However, the problem is not that the alleged contract lacks valid consideration. Rather, the issue is whether the alleged contract — the March 15th letter — operated to replace Hyatt (and release Hawthorn) as the liable party for any potential future breach of the MLA.

Hyatt contends it did not and that Monopoly's claim is contrary to the documentary evidence, specifically the two post-March 15th contract addendums executed between Monopoly and Hawthorn demonstrating the continuation of their contractual relationship under the MLA. On June 3, 2005, Hawthorn and Monopoly entered into the Third Addendum to the MLA extending Monopoly's payment and development obligations. On November 24, 2006, Hawthorn and Monopoly entered into the Fourth Addendum to the MLA expanding Monopoly's approved territory by granting Monopoly the right to develop Hawthorn hotels in additional countries. Unlike the March 15th letter, the Third and Fourth Addendums formally modified the original terms of the MLA and expressly

stated that there were no other modifications to the MLA and that all other terms and conditions of the MLA remained in full force and effect.

As Monopoly points out, however, much of Hyatt's argument ignores the parties' course of conduct. Despite Hyatt's legal position taken in the summary judgment briefing, Hyatt itself expressly acknowledges that: (1) Hawthorn did not terminate the MLA, as was its right as set forth in the March 15th letter, based on Monopoly's failures to comply with the development schedule and to timely pay the installments due on the initial franchise fee, (Def.'s SMF ¶ 25); (2) after sending the March 15, 2005 letter, Hawthorn extended both the development and payment schedules via the Third Addendum to the MLA, (*Id.* ¶ 42); (3) Hyatt participated in the process of reviewing and approving Monopoly's proposals after the March 15th letter, (*Id.* ¶¶ 33, 48); (4) Hyatt's representatives Michael Shindler, Jim Abrahamson, and Rakesh Sarna each served on the Approval Committee at some point, (*Id.* ¶ 46); (5) after Mike Leven was replaced, Hyatt's representatives constituted the majority of the Committee, (Def.'s SMF ¶ 46; Def.'s Resp. SMF ¶ 69); (6)Monopoly was advised that Hyatt's interests would be considered in assessing Monopoly's proposals, (*Id.* ¶¶ 33, 50); and (7) the Approval Committee approved several of Monopoly's proposals, (*Id.* ¶¶ 51, 52, 53, 54, 68, 75) and rejected others (*Id.* ¶ 61). Hyatt's argument that the terms of the MLA relating to the approval of Monopoly's franchise proposals were never changed is hard to stomach in the face of Hyatt's own version of the facts set forth above. While there is no formal Addendum to the MLA executed by Hawthorn

and Monopoly, Hyatt cannot deny that the use of the Approval Committee was a modification of the approval process under the original terms of the MLA. (*See* Flora Dep. at 84-85 (testifying that the MLA did not provide for Hyatt's participation in the approval process); Jones Dep. at 95-96 (testifying that the imposition of the Approval Committee was a change in the process)).

Unfortunately for Monopoly, this evidence alone falls short of establishing a contract between Monopoly and Hyatt or Hawthorn's release from its contractual obligations under the MLA related to the review and approval of Monopoly's franchise proposals. This is so — even accepting Monopoly's version of the facts that after the March 15, 2005 letter and the execution in June 2005 of the Third Addendum, Hawthorn ceased approving any hotel proposals and Hyatt exercised exclusive control on behalf of the Approval Committee as the "final gatekeeper" for every Monopoly proposal thereafter.[11] (Pl.'s Br. at 18-19, 23-25; Pl.'s Reply, Doc. 130 at 13.) Monopoly points to nothing in the record that Hyatt evidenced its intent to replace Hawthorn as either the responsible party or as a beneficiary under the MLA solely by participating on the Approval Committee or controlling the approval process. (MLA § 14.C (providing that "[t]his Master Agreement is exclusively for the benefit of the parties hereto and it shall not give

---

[11] In deciding Hyatt's Motion for Summary Judgment, the Court has viewed the evidence in the light most favorable to Monopoly and drawn all inferences in its favor. The Court notes there is evidence of Mr. Flora's apparent unilateral decision not to forward the Ras Al Khaimah development proposal to the Approval Committee until after Monopoly's developer had terminated its contract. While the Court recognizes Hyatt's argument that the Approval Committee ultimately approved the Ras Al Khaimah proposal within 30 days of Mr. transmission of the proposal, Mr. Flora had delayed for months its submission. Yet, Mr. Flora may have had strategic reasons for holding back the proposal while the WTC proposal was still pending.

rise to liability to a third party, except as otherwise specifically set forth herein"). Nor has Monopoly pointed to any authority that Hyatt's conduct constitutes ratification of the alleged contract under Georgia law. *See e.g., Shivers v. Sexton*, 296 S.E.2d 749, 751 (Ga. Ct. App. 1982) (affirming summary judgment in favor of corporation on the ground that it was not a party to the contract sued upon where the record was devoid of any evidence raising the issue of ratification by the corporation of the alleged agent's actions in entering into contract because "the mere fact that [the corporation], at [the alleged agent's] direction, may have derived some benefits from the agreement [the plaintiffs] entered into with [the agent] is insufficient to establish or even imply an agency relationship" necessary to legally bind corporation to terms of contract to which it was not a signatory).[12]

Other than an ability to control the approval process, Monopoly makes no attempt to explain what benefit Hyatt gained under either the March 15th letter or the MLA. There is no evidence that Monopoly ceased paying its franchise fees to Hawthorn and began paying those fees to Hyatt. And while Hyatt requested

---

[12] In *Shivers v. Sexton*, the plaintiffs Shivers and Gilbert, brought suit against Sexton and Barton & Ludwig, Inc. with whom the plaintiffs alleged they had entered into a limited partnership, seeking an accounting of all funds paid into the partnership. Barton & Ludwig was not a signatory to the partnership agreement, but the plaintiffs argued that there was evidence from which they might assume Sexton was acting as Barton & Ludwig's agent, or, alternatively, that Barton & Ludwig ratified Sexton's actions, and thereby adopted his conduct as its own. The evidence of record in this regard included a letter written by Sexton on stationery bearing a Barton & Ludwig letterhead thanking plaintiffs for "placing your confidence in Barton/Ludwig, Inc., with your investment" in the partnership, and welcoming them into the "Barton/Ludwig family." Plaintiffs also offered affidavits stating that, after the formation of the partnership, some checks were made payable to Barton & Ludwig at Sexton's direction. Reciting Georgia law that "[w]hen the fact of agency is to be proved by the *subsequent ratification* and adoption of the act by the principal, there must be *evidence* of previous knowledge, on the part of the principal, *of all the material facts*," the court found the record devoid of any evidence of ratification. 296 S.E.2d at 751 (emphasis in original).

additional documentation to support the market need for the developments, as was its right under the terms of both the MLA and the March 15th Letter, there is no evidence that Hyatt requested or required any changes to the actual developments during the review or approval process. (*See* MLA § 3.B ("Master Licensee   shall submit to Licensor for approval or disapproval such site information, franchisee application materials, and other information as Licensor reasonably requests for approval of proposed franchisees and Hotels."); March 15, 2005 Letter, Doc. 40-2 p. 126. ("We will approve projects only if . . . the projects meet our approval criteria and you provide us with any information we need to assist in the approval process.").)   Both parties acknowledge that the purpose of including Hyatt in the decision making process was to ensure that Monopoly's proposed developments were aligned with what Hyatt was doing because there were certain "competitive restrictions" in Hyatt's own hotel management agreements in the Territory that Hyatt believed could impact Monopoly's ability to develop Hawthorn hotels in certain areas.   (Pl.'s Br., Doc. 122-1 at 6; Def.'s Resp., Doc. 127 at 17-18.)   While Hyatt's participation on the Approval Committee gave it the ability to consider Hyatt's interests in any development approval, there is no evidence that Hyatt ever denied a Monopoly proposal because of the existence of a Hyatt in the market/territory.   Instead, the evidence is that Hyatt approved Monopoly's proposals in Dubai and Casablanca despite the presence (or anticipated presence) of a Hyatt hotel in those markets. (Pl.'s Resp. SMF ¶ 51; Def.'s SMF ¶¶ 64, 68, 75.)

Perhaps the best illustration of the weakness in and conclusory nature of Monopoly's "replacement" contract theory is Hyatt's hypothetical scenario:

> Assume, for example, that Hawthorn's March 15th letter advised Monopoly that the Approval Committee would be comprised of one representative from Hawthorn and two third-party hotel consultants. Under Monopoly's view of contract law, Monopoly's acceptance of Hawthorn's proposal [and the participation by these consultants on the committee] would create a contractual relationship with each of those consultants.

(*Id.*) The Court acknowledges there are some obvious differences between a parent company and a third-party consultant. Those differences are immaterial where, as here, there is no evidence to support holding a parent company liable for the contractual obligations of its subsidiary. *See Kissun v. Humana, Inc.*, 479 S.E.2d 751, 754 (Ga. 1997) (holding that Georgia law recognizes that the limited liability of the corporate veil can be pierced and a parent corporation can be liable on the part of its subsidiary only under one of three intertwined theories: (1) the alter ego doctrine; (2) the theory of apparent or ostensible agency; or (3) the theory of joint venture[13]).

Under Georgia law, the "cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders." *Amason v. Whitehead*, 367 S.E.2d 107, 108 (Ga. Ct. App. 1988).

---

[13] The theory of "[j]oint venturer liability holds all joint venturers liable for the negligence of the others," and is not applicable to claims for breach of contract. *Adams v. Unum Life Ins. Co. of America*, 508 F. Supp. 2d 1302, 1315 (N.D. Ga. 2007); *see also Kissun*, 479 S.E.2d at 752("The theory of joint venturers arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the *negligence* of the other.")

"The concept of piercing the corporate veil is applied in Georgia to remedy injustices which arise where a party 'has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility.'" *Id.* (quoting *Jenkins v. Judith Sans Intl.*, 332 S.E.2d 687 (Ga. Ct. App. 1985). Thus, while the "legal entity of a corporation may be disregarded" under this equitable principle, "great caution should be exercised by the court in doing so," and "there must be evidence of abuse of the corporate form":

> In order to disregard the corporate entity because a corporation is a mere alter ego or business conduit of a person, it should have been used as a subterfuge so that to observe it would work an injustice. To prevail based upon this theory it is necessary to show that the shareholders disregarded the corporate entity and 'made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist.

*Id.* (citing *Farmers Warehouse v. Collins*, 137 S.E.2d 619 (Ga. 1964). "Sole ownership of a corporation by one person or another corporation is not a factor, [] and neither is the fact that the sole owner uses and controls it to promote his ends." *Id.* (internal citations omitted). Lastly, Georgia law requires, "as a precondition to a plaintiff's piercing the corporate veil . . . that there be insolvency on the part of the corporation in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim." *Johnson v. Lipton*, 328 S.E.2d 533, 535 (Ga. 1985)

All Monopoly has shown is that Hyatt meddled in the affairs of Hawthorn to ensure Hyatt's interests were taken into consideration with respect to Hawthorn's contract with Monopoly — and did so with the consent of both Hawthorn and Monopoly.  This is insufficient under basic principles of contract and corporate law.  Monopoly makes no argument and offers no evidence that Hawthorn was the mere agent or alter ego of Hyatt necessary to pierce the corporate veil afforded to Hyatt.  *Kissun*, 479 S.E.2d at 754 ("A parent/subsidiary relationship does not in and of itself establish the subsidiary as either the alter ego of the parent," rather "[u]nder the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another," i.e. that the subsidiary corporation was "so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation."); *Amason*, 367 Ga. App. at 109 (declining to pierce corporate veil where there was "no evidence of fraud, no abuse of the corporate form, no commingling of assets and not even a showing of corporate insolvency at the time of the transaction"); *Perry v. v. Unum Life Ins. Co. of America*, 353 F. Supp. 2d 1237, 1239-40 (N.D. Ga. 2005) (holding that insured could not assert breach of contract claim against parent company that was not a party to the contract absent allegations that subsidiary had insufficient assets to satisfy a such a claim at time of transaction as necessary to pierce the corporate veil and hold the parent liable

under an alter ego theory for the alleged contractual breach); *Adams v. Unum Life Ins. Co. of America*, 508 F. Supp. 2d 1302, 1314-16 (N.D. Ga. 2007) (granting summary judgment on insured's breach of contract claim in favor of non-party parent company where the plaintiff failed to offer evidence of corporate insolvency or that the defendants' corporate forms were being used to work an injustice and prevent the plaintiff from satisfying any judgment she may obtain in the case required under Georgia law to disregard the corporate form because a corporation is a mere alter ego or business conduit of another). Monopoly has not shown, or even attempted to show, that Hawthorn was insolvent at the time of the March 15, 2015 letter, or that Hyatt's and Hawthorn's corporate forms were used to defeat justice or allow Hawthorn to evade its responsibility under the MLA. Thus, there is no evidence from which the Court could find to hold Hyatt, as a non-party to the MLA or its Addendums, liable for any alleged breach of contract suffered by Monopoly. Monopoly's contract was with Hawthorn — not Hyatt. Monopoly agreed to let Hawthorn cede its unilateral authority to approve proposals under the MLA and allow Hyatt to exercise its influence over the process. To the extent Monopoly suffered any harm from the failure to timely approve its franchise proposals, its remedy under the MLA was against Hawthorn. Monopoly chose, at its peril, to settle its claims with Hawthorn and release it from any further liability prior to filing suit in this Court.[14]

---

[14] Also, by agreeing to the terms of Hawthorn's March 15th letter, Monopoly agreed as follows: "You should not make any binding commitments with respect to a project until you have our written approval for the project. We are not responsible to you or any third parties you deal

Accordingly, the Court finds that there was no contract between Monopoly and Hyatt and **GRANTS** Hyatt's Motion for Summary Judgment [Doc. 40] and **DENIES** Monopoly's Motion for Summary Judgment [Doc. 122] as to Count One of Monopoly's Complaint for breach of contract. Having found no contract existed between Monopoly and Hyatt, the Court need not consider Hyatt's remaining statute of frauds argument or Monopoly's argument that Hyatt breached the implied covenant of good faith and fair dealing which is derivative of the existence of a contract.

### B. Count II - Breach of Fiduciary Duty: Whether Monopoly has established a fiduciary relationship with Hyatt

Hyatt seeks summary judgment in its favor on Monopoly's breach of fiduciary duty claim due to the absence of a fiduciary obligation owed by Hyatt to Monopoly. The alleged fiduciary duty stems from Monopoly's allegation that:

> In replacing Hawthorn as the party responsible for approving or disapproving franchisee and site selection pursuant to Section 3.B of the MLA, Hyatt had a relationship of confidence with Monopoly. Accordingly, Hyatt owed Monopoly a strict fiduciary duty as it was so situated as to exercise a controlling influence over the will, conduct and interest of Monopoly, and was required to act in the utmost good faith and furtherance of a common business objective — to develop hotels in the Territory. As such, Monopoly and Hyatt were under a duty to represent and advance the other's interests.

(Compl. ¶ 36.)

In every fiduciary or confidential relationship, Georgia law imposes upon the parties the duty of exercising the utmost good faith and loyalty one another,

---

with for any losses incurred because we did not approve a project. Your best protection against incurring any such losses is to wait until the approval process is complete before entering into any binding commitments." (March 15, 2005 Letter, Doc. 40-2, at p. 126.)

including the duty to act primarily and solely for the benefit of each other. *See Dolvin Realty Co. v. Holley*, 48 S.E.2d 109 (Ga. 1948), *superseded by statute on other grounds as stated in Killearn Partners, Inc. v. Southeast Properties, Inc.*, 611 S.E.2d 26 (Ga. 2005); *AAF-McQuay, Inc. v. Willis*, 707 S.E.2d 508, 516-17 (Ga. Ct. App. 2011); *Bloodworth v. Bloodworth*, 579 S.E. 2d 858, 861-62 (Ga. Ct. App. 2003); *Enchanted Valley RV Resort, Ltd. v. Weese*, 526 S.E.2d 124, 131 (Ga. Ct. App. 1999). "It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Jonas v. Jonas*, 633 S.E.2d 544, 549-50 (Ga. Ct. App. 2006); *Griffin v. Fowler*, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003). The party asserting the existence of a fiduciary or confidential relationship bears the burden of proving its existence. *Premier/Georgia Management Company, Inc. v. Realty Management Corp.*, 613 S.E.2d 112, 118 (Ga. Ct. App. 2005); *Bowen v. Hunter, Maclean, Exley & Dunn*, 525 S.E.2d 744, 748 (Ga. Ct. App. 1999) (citing *Crawford v. Crawford*, 67 S.E. 673 (Ga. 1910)).

Under Georgia law, a fiduciary relationship may arise by law, contract, or the facts of a particular case. *Douglas v. Bigley*, 628 S.E.2d 199, 204 (Ga. Ct. App. 2006); O.C.G.A. § 23-2-58. Generally, business relationships are not confidential or fiduciary relationships. *Williams v. Dresser Industries, Inc.*, 120 F.3d 1163, 1168 (1997) (citing *Dover v. Burns*, 196 S.E. 785 (Ga. 1938)); *Newitt v. First Union Nat. Bank*, 607 S.E.2d 188, 196 (2004) ("[M]ost business

relationships [however] are not generally confidential or fiduciary relationships."). "Where parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests." *Newitt,* 607 S.E.2d at 196 (citing *Kienel v. Lanier*, 378 S.E.2d 359 (1989)).

"In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *Newitt*, 607 S.E.2d at 196 (quoting *Kienel,* 378 S.E.2d 359). The mere fact that one reposes trust and confidence in another's integrity does not create a confidential relationship. *Williams*, 120 F.3d at 1168 (citing *Dover v. Burns*, 196 S.E. 785 (Ga. 1938)); *Automated Solutions Enterprises, Inc. v. Clearview Software, Inc.*, 567 S.E.2d 335, 338 (Ga. Ct. App. 2002). "A fiduciary or confidential relationship arises only 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.'" *Newitt*, 607 S.E.2d at 196 (quoting O.C.G.A. § 23-2-58).

A confidential and fiduciary relationship will not be found unless the party asserting the relationship presents proof of such relationship by clear and convincing evidence. *Allen v. Hub Cap Heaven, Inc.*, 484 S.E.2d 259, 264 (Ga. Ct. App. 1997); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1579-80 (N.D. Ga. 1992) (granting summary judgment to vehicle

manufacturer on dealer's breach of fiduciary duty claim where dealer failed to show manufacturer exercised complete control over dealer's business necessary to impute fiduciary obligation).

Hyatt asserts that Monopoly seeks to impose on Hyatt obligations that exceed those that were owed to it by Hawthorn — the party Hyatt is alleged to have replaced — under the express terms of the MLA. Those terms gave Hawthorn sole authority to review, comment, and approve Monopoly's proposals. But despite Hawthorn's control over the approval of Monopoly's franchise proposals (prior to the March 15th modification calling for the use the Approval Committee) the parties expressly agreed that there was no fiduciary relationship between them. (MLA § 13.A providing "Master Licensee [Monopoly] is an independent contractor. Neither party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever. Licensor [Hawthorn] and Master Licensee [Monopoly] expressly acknowledge that the relationship intended by them is a business relationship based entirely on, and defined by, the express provisions of this Master Agreement and that no partnership, joint venture, agency, fiduciary, or employment relationship is intended or created by reason of this Master Agreement.") Thus, Hyatt asserts, even accepting Monopoly's "replacement" allegation as true, there is no basis for imposing on Hyatt duties that exceed those that Hawthorn owed Monopoly for allegedly performing the very same responsibilities.

Georgia courts have held that fiduciary duty claims fail where the parties' relationship stems from a contractual agreement and the contract expressly provides that it does not give rise to a confidential, fiduciary, or agency relationship between the parties. *Automated Solutions Enterprises, Inc.*, 567 S.E.2d at 338 (holding that trial court did not err in granting summary judgment against plaintiff where the parties' agreements provided that the contract established no agency, partnership, or joint venture between the parties and that the plaintiff was an independent contractor and not an employee or agent); *Allen v. Hub Cap Heaven*, 484 S.E.2d 259, 264 (Ga. Ct. App. 1997) (holding that no confidential relationship existed where "[t]he franchise contract expressly provided for an independent contractor relationship between Hub Cap Heaven and its franchisees"); *Newitt*, 607 S.E.2d at 196 (finding no jury issue as to whether a fiduciary or confidential relationship existed between the parties where the plaintiffs' contract with the defendant "expressly stated that there was no fiduciary relationship" and "expressly acknowledged that the transaction was one at 'arm's length' and that the [defendant] did not bear any fiduciary relationship to [the plaintiff]"); *Prince Heaton Enterprises., Inc. v. Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d 1357, 1365 (N.D. Ga. 2000) (finding plaintiff's allegations that confidential relationship existed between franchisor and franchisees failed by virtue of the parties' franchise contractual agreement stating that "this Agreement does not establish a fiduciary relationship between [the parties]"). Moreover, under Georgia law, a franchisor does not generally owe a

fiduciary duty to its franchisees. *Allen*, 484 S.E.2d 259 (Ga. Ct. App. 1997); *Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d at 1365; *Williams*, 120 F.3d at 1168 (noting absence of case law finding a confidential relationship between a franchisor and franchisee); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1579 (N.D. Ga. 1992) (collecting cases that find no fiduciary relationship between franchisor and franchisee).

In response, Monopoly claims that Hyatt cannot rely on the fiduciary disclaimer in the MLA because Hyatt admits it was not a signatory to the MLA and could have bargained for a similar term to govern its contractual relationship with Monopoly. Monopoly's argument is non-sensical and is contradicted by Monopoly's principal's own testimony regarding the scope of his alleged contract with Hyatt. (*See* Monopoly Dep. Vol. I, 150-152 (testifying that (1) the terms of Monopoly's contract with Hyatt were the same as the original Master License Agreement and the terms set forth in the March 15, 2005 letter, (2) Hyatt's obligations under the contract were per the terms of the Master License Agreement, and (3) the term of the contract with Hyatt was for the balance of the 99 years under the MLA). This entire litigation arises out of Monopoly's MLA with Hawthorn as demonstrated by Monopoly's own filings in response to Hyatt's summary judgment motion. (*See* Pl.'s Resp. SMF ¶ 32 (citing Mavrak Decl., ¶ 38, Ex. 49a, and responding that "when John Mavrak wrote to Mr. Flora that "I have no agreement with Hyatt," . . . [h]e was not referring to Hyatt['s] obligations to deal with Monopoly in good faith [] pursuant to the terms of the MLA, so long as

they controlled the Approval Committee").)  Monopoly cannot seek to bind Hyatt to the terms of this agreement on the one hand and simultaneously disavow it on the other.  Based on the evidence, Monopoly cannot legitimately dispute that its alleged relationship with Hyatt stems from the MLA.  If Hawthorn owed no fiduciary duty to Monopoly by virtue of its franchise licensing agreement, Hyatt cannot reasonably be said to owe such a duty either by virtue of its role in the parties' relationship in light of Monopoly's agreement to the additional terms of the March 15th letter giving Hyatt a direct role in the approval process.

Hyatt further contends that Monopoly's claim runs counter to the very nature of the parties' relationship and Monopoly's understanding of that relationship.  As explained above, "[w]here parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests." *Newitt,* 607 S.E.2d at 196 (citing *Kienel v. Lanier*, 378 S.E.2d 359 (1989)); *Allen*, 484 S.E.2d at 264 (finding no confidential relationship between independent contractor franchisee and franchisor who engaged in business transaction to further their own separate business objectives); *Automated Solutions Enterprises, Inc.,* 567 S.E.2d at 338 (same); *Williams*, 120 F.3d at 1168 (applying *Allen's* holding that no confidential relationship existed between a franchisor and franchisee, where the transaction at issue was between the parties, each attempting to further their own separate business objectives, rather than joining together to achieve a common business objective).  Here, the MLA provided that Monopoly was an independent

contractor, was not engaging in a joint venture with Hawthorn, and that Hawthorn and its parent and affiliated companies could be competing with Monopoly in the Territory. (*See* MLA § 13.A; MLA § 2 (stating that "Master Licensee [Monopoly] acknowledges that Licensor [Hawthorn], its parent, subsidiaries, divisions, and affiliates are and may in the future be engaged in other business activities including activities involving transient lodging and related activities that may be, or that may be deemed to be, competitive with the Hotel System, both within and outside the Territory [.]"). Without pointing to any actual evidence in the record, Monopoly asserts that Hyatt and Monopoly had a common business objective of developing hotels in the licensed territory. Monopoly's argument is wholly unsupported by the record before the Court and contradicted by the terms of the contract and Mr. Mavrak's own testimony. In addition to the terms in the MLA, the March 15th letter establishes that as Hawthorn's parent, Hyatt's sole interest was in maintaining the integrity of its brand, not in furthering Monopoly's business. Mr. Mavrak acknowledged that Hyatt could consider its own interests in considering whether to approve or disapprove a project (as long as Hyatt acted fairly and justly). (Monopoly Dep. Vol I, 154.) Mr. Mavrak testified that he understood that Hyatt's interests would be considered in deciding whether projects would be approved or disapproved. (*Id.* at 154-55.) Mr. Mavrak also acknowledged that he knew when he agreed to let Hyatt approve the proposals that Hyatt was not looking solely after Monopoly's interests. (*Id.* at 157-58.) Despite Mr. Mavrak's belief that Hyatt had

to operate in good faith in exercising its approval, (*see id.*), "the duty of good faith required in every contract . . . does not give rise to a fiduciary duty." *Capital Ford Truck Sales*, 819 F. Supp. at 1579-80.

Monopoly asserts that some confidential/fiduciary relationships may exist between businessmen depending on the facts. (Pl.'s Resp. at 16-17 (citing generally *Cochran, v. Murrah*, 219 S.E.2d 421 (Ga. 1975)[15]). Monopoly has failed to point this Court to a case finding the existence of a fiduciary relationship in circumstances similar to those presented here. Monopoly relies only on the assertion that by virtue of exercising control over the approval process, "Hyatt was so situated as to exercise a controlling influence over the will, conduct, or interest of Monopoly." (*Id.* at 17.) However, it is only when one party assumes and exercises virtually complete and absolute control over all aspects of another party's business as it relates to the transaction, do courts hold that a fiduciary duty will arise. *Capital Ford Truck Sales*, 819 F. Supp. at 1579-80 (citing *In re N & D Properties, Inc.*, 799 F.2d 726, 732 (11th Cir. 1986) and holding that franchisee offered no evidence that franchisor exercised absolute control over franchisee's day-to-day operations necessary to suggest the type of control required to impute a fiduciary duty).

Finally, Monopoly asserts that the existence of a fiduciary relationship is a factual question for trial. "Although the existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue, when the

---

[15] *Cochran* is not a case involving businessmen – but an employment relationship between a farm owner and his laborer.

facts do not authorize a finding of a confidential relationship, the trial court does not err in deciding the issue as a matter of law." *Williams*, 120 F.3d at 1168 (finding as undisputed the evidence that the parties' transaction was, plainly and simply, an arms-length business transaction). Accordingly, the Court finds that Monopoly has failed to meet its burden of establishing the actual existence of a genuine issue of material fact that precludes summary judgment in favor of Hyatt that no confidential or fiduciary relationship existed between Monopoly and Hyatt.

Therefore, the Court **GRANTS** Hyatt's Motion for Summary Judgment [Doc. 40] and **DENIES** Monopoly's Motion for Summary Judgment [Doc. 122] as to Count Two of Monopoly's Complaint for breach of fiduciary duty. Having granted summary judgment in favor of Defendant as to Monopoly's two underlying substantive claims, Hyatt is entitled to summary judgment as to Monopoly's derivative claims for attorney's fees and punitive damages.

## V.    Conclusion

Monopoly's submissions are characterized by a furious sense of being wronged at the hands of Hyatt. And that is understandable. Prior to the institution of the Approval Committee made up of a majority of Hyatt executives, Monopoly was banking on a fast-track to making millions of dollars developing high end hotels in its expansive international territory. Instead, Monopoly's success was railroaded by Hyatt's plans to restructure its business model by offloading its franchise component rather than rolling the dice on a successful

growing franchise market. While Hyatt's practices might well have been sharp and self-serving, they do not give rise to liability for breach of contract or breach of a confidential fiduciary relationship.

Accordingly, the Court **GRANTS** Hyatt's Motion for Summary Judgment [Doc. 40] and **DENIES** Monopoly's Motion for Summary Judgment [Doc. 122] as to each of Monopoly's claims. The Court **DIRECTS** the Clerk to enter judgment in favor of Defendant and close the case.

**IT IS SO ORDERED** this 16th day of August, 2016.

**Amy Totenberg**
**United States District Judge**